GEORGE L. BRIGGS *vs.* MARY WESTON & others.

Essex.    October 10, 1935. — May 27, 1936.

Present: FIELD, DONAHUE, LUMMUS, & QUA, JJ.

*Probate Court,* Jury issues. *Unsound Mind. Undue Influence. Evidence,* Presumptions and burden of proof.

On statements of expected evidence, a probate court rightly granted a jury issue as to the soundness of mind of an alleged testatrix who was suffering from a large brain tumor when she made her will a few days before her death and who had periods when she had testamentary capacity and periods when she did not have it.

It was error for a probate court to frame a jury issue as to whether a will had been procured to be executed by undue influence of certain persons, on statements of expected evidence which went no further than

to show that the decedent was susceptible to influence and that such persons had some opportunity to exert it, there being no statement of substantial expected evidence that they had done so.

PETITION, filed in the Probate Court for the county of Essex on April 28, 1934, for proof of the alleged will of Helen A. Huntington, late of Amesbury.

A motion for jury issues was heard by *O'Brien,* J.

*J. W. Sullivan,* (*P. I. Lawton* with him,) for the petitioner and another.

*C. B. Rugg,* (*W. F. Farr* with him,) for the respondents.

FIELD, J.     The probate of an instrument dated April 18, 1934, purporting to be the will of Helen A. Huntington, late of Amesbury, who died April 23, 1934, in which George L. Briggs is named as executor, is contested by the sole heir at law and next of kin of the deceased and other persons named as legatees in an instrument dated December 10, 1920, also purporting to be the will of the deceased. See *Crowell* v. *Davis,* 233 Mass. 136. On motion of the contestants the probate judge framed issues for trial by jury relating to soundness of mind of the deceased and to fraud or undue influence of "George L. Briggs and A. Lester Rundlett or any of them exercised" upon the deceased. No issue relating to execution of the will was framed. George L. Briggs and A. Lester Rundlett appealed from the order.

In the claim of appeal both George L. Briggs and A. Lester Rundlett are described as executors. But A. Lester Rundlett is not named in the instrument offered for probate as an executor. He is named therein as a legatee. No contention, however, is made that by reason of these circumstances the appeal is not properly before us. See *Old Colony Trust Co.* v. *Bailey,* 202 Mass. 283, 290–291. At any rate, George L. Briggs was a "person aggrieved" by the order framing issues and had a right to appeal therefrom. See G. L. (Ter. Ed.) c. 215, § 9.

The case was heard in the Probate Court on statements by counsel of expected evidence. Statements were made not only by counsel for the contestants in support of the motion, but also by counsel for the proponent in opposition thereto. See *Smith* v. *Patterson,* 286 Mass. 356, 358,

Issues for trial by jury on a petition for probate of a will are not to be framed in the Probate Court unless it appears from statements by counsel of expected evidence or otherwise that there is "a genuine question of fact supported by evidence of such substantial nature as to afford ground for reasonable expectation of a result favorable to the party requesting the framing of issues." *Smith* v. *Patterson*, 286 Mass. 356, 358-359. And on appeal this court reviews the entire case. But even where, as here, the case was heard on statements by counsel of expected evidence, this court, by reason of the element of discretion involved, gives to the decision of the probate judge the weight to which it is entitled in the light of the whole record. *Clark* v. *McNeil*, 246 Mass. 250, 254-256. *Cranston* v. *Hallock*, 281 Mass. 182, 184. *Crosby* v. *Tracy*, 290 Mass. 46, 48.

The deceased at the time of her death was fifty-six years old. She was unmarried. Her sole next of kin and heir at law was an uncle living in New Hampshire. The instrument offered for probate, though dated April 18, 1934, was in fact signed on April 19, 1934. It is in writing on a printed form. By it the sum of $10,000 is given to George L. Briggs in trust to pay the income thereof to the uncle of the deceased for his maintenance and support, and to use the principal for such purpose if the trustee deemed it necessary and advisable, and upon the decease of said uncle to pay the principal remaining to the residuary legatees, to be equally divided between them. A life interest in real estate in New Hampshire is given to the uncle. The sum of $5,000 is given to A. Lester Rundlett in trust to apply the income thereof to the education of his daughter, Joanne Rundlett, and to pay the principal thereof to this daughter when she attains the age of twenty-one years. The deceased's automobile is given to A. Lester Rundlett and her furs to "Onie Finnegan." After provisions for perpetual care of a cemetery lot and headstone the residue of the estate is given to George L. Briggs and A. Lester Rundlett to be divided equally between them. The estate of the deceased exceeds $60,000 in amount. George L. Briggs, named in the instrument offered for probate as the executor and a residuary legatee, was named as

one of the executors in the instrument of earlier date. For some time the deceased had relied on him in matters affecting her property in Amesbury. A. Lester Rundlett, the other residuary legatee, had been the deceased's chauffeur for about four years immediately prior to her death.

1. It was not error to frame an issue relating to the soundness of mind of the deceased.

The ground for the contestants' contention that the deceased was not of sound mind when the alleged will was signed is that she then had a brain tumor, for the removal of which an operation was performed on the morning of April 20, 1934. The deceased never recovered consciousness and died about two o'clock on the morning of April 23, 1934. The surgeon who performed the operation would testify that the tumor "involved the right side of the brain on the frontal and temporal region," that it "was incorporated in the brain substance" and "was about the size of a goose egg," that "the condition was fundamentally inoperative, and that it, the tumor, could not be removed, because it was so large." The physical condition of the deceased at the time she signed the alleged will awakens caution to see "if mental capacity is impaired or gone" (*Whitney* v. *Twombly*, 136 Mass. 145, 147, 148, *Old Colony Trust Co.* v. *Whitney*, 269 Mass. 519, 523), but the existence of the brain tumor, as described, would not raise a genuine question of fact as to impairment of the mental capacity of the deceased without further evidence of her conduct indicating such impairment, or medical testimony to the effect on mental capacity of such a tumor.

Apart from expected testimony of the deceased's family physician for nearly forty years that "she acted strangely in his office" in the fall of 1933, there is no statement of expected evidence tending to show impairment of her mental capacity prior to March 21, 1934. Witnesses, however, would testify to specific instances of strange actions or confused thought on her part on that day and on several other days prior to April 5, 1934. On April 5 the deceased entered the Amesbury Hospital and on April 18 she was transferred by ambulance to the Massachusetts General Hospital in Boston, where she remained until her death. Her family

physician would testify that upon his return from spending the winter in Florida he took charge of the case and that while she was a patient in the Amesbury Hospital her "mind was confused and on certain other occasions when he asked her how she felt she made no response, but indulged in silly laughter."

The contestants rely principally on expected evidence, consisting of hospital records, testimony of a nurse who cared for the deceased and was a witness to the will, testimony of a resident pathologist at the hospital in Boston, and opinions of two experts in mental diseases not based on personal observation of the deceased, and on the disposition of property made by the alleged will. The expected evidence shows specific instances after the deceased first entered the Amesbury hospital of her being "drowsy" or "sleepy," and while in the hospital in Boston being "increasingly drowsy and sleepy," of her being "confused," showing "poor memory," being "incoherent in her speech," failing to know where she was and thinking she was at home, and failing to recognize a friend of long standing.

The alleged will was signed by the deceased at some time late in the afternoon of April 19 while she was bolstered up in bed. She said nothing. The nurse would testify that on April 18 the deceased "was in a complete stupor in the early morning for over an hour," that the lawyer — who had spent some time with the deceased the evening before — could not see her, that in the afternoon the deceased appeared "at times rational, at other times irrational, and at other times extremely drowsy," and that on April 19 the deceased did not realize where she was and apparently at times thought that she was at her home in Amesbury. This nurse, however, would testify that in the afternoon of April 19, with the approval of a physician at the hospital, she asked the deceased if it would be all right to bring the lawyer in, and the deceased said, "All right." The lawyer then came to see the deceased and the will was signed. The resident pathologist would testify that he examined the deceased on the afternoon of April 18 and that she "was unable to orient herself, that she did not know where she was, and that dur-

ing his conversation with her she lapsed into a coma," and that he examined her the next day and found that she was "slightly brighter . . . but not normal."

The disposition of the property made by the alleged will does not go far to show any lack of comprehension on the part of the deceased of her relation to her living kindred and her friends or to her property, even when compared with the disposition of her property made by the instrument dated more than thirteen years earlier. See *Sheppard* v. *Olney*, 271 Mass. 424, 426. There was ample time for a change in her intentions as to the disposition of her property. The provisions for her only heir at law and next of kin were changed by eliminating a substantial outright gift to him, but in other respects were not altered materially. The earlier instrument contained very substantial provisions for Mrs. Finnegan. And counsel for the contestants stated expected evidence tending to show that the relation of the deceased to her was intimate up to the time the instrument in question was signed, but there are statements by such counsel and by counsel for the proponent of expected evidence supplying some explanation of the change in the provisions made for Mrs. Finnegan. The earlier instrument contained legacies to individuals and to churches and other institutions of a charitable nature not mentioned in the later instrument. Counsel for the contestants stated some expected evidence tending to show that the interest of the deceased in the institutions continued unabated until the instrument now in question was signed, but there were statements by counsel for the proponent of evidence, apparently undisputed, at least consistent with changes of attitude of the deceased toward these institutions. It is stated that, with the exceptions of the uncle of the deceased and Mrs. Finnegan, the individual legatees under the earlier instrument were neighbors and in most instances life-long friends of the deceased. Undisputed changes in the relation of the deceased to such individuals, in some instances, tend to explain the omission of gifts to some of these individuals from the later instrument. And expected evidence stated by counsel for the proponent furnishes some explanation of

the gifts to Briggs and Rundlett. As the case was presented, with a possible exception of the only heir at law and next of kin, it is largely matter of speculation who would be the natural recipients of the bounty of the deceased.

The opinions of two experts on mental diseases, stated by counsel for the contestants, are based so largely on the assumption that the alleged will was unnatural in its disposition of the property of the deceased, that their conclusions as to her testamentary capacity are not of great weight. *Wellman* v. *Carter*, 286 Mass. 237, 243. The opinion of one of them, however, as to the effect on such capacity of a brain tumor, such as the deceased undoubtedly had, was entitled to weight. According to the opinion of this expert, a patient having such a tumor might "when aroused have a memory of the value and distribution of her estate; she might even have some knowledge of the relationships of others to her and the claims that they have on her bounty. It is not likely that she would have the initiative to make a will or to desire to do so . . . . In other words, she would probably be deficient in testamentary capacity. In this case, according to the examination made by the pathologist . . . she probably lacked all the elements of testamentary capacity, but certainly lacked a free and initiating will." According to statements by counsel for the proponent, however, two experts in mental diseases would express a contrary opinion. One of them would testify in substance "that a tumor growing in this region would cause slight or possibly no cerebral symptoms particularly of the intellectual type," that the effect of such a tumor is "to produce somnolence, sleep, put the person right to sleep when they would be talking to you, but when that pressure was removed, when they came out of it there was no resulting effect at all upon the mental processes of that person."

According to the statement of counsel for the proponent the physician who approved the action of the nurse in connection with the lawyer's coming to see the deceased at the hospital in Boston would testify that he told her that "As this woman is to be operated on tomorrow, if there is any paper she didn't finish she should have it done

today as a matter of common precaution." But there is no statement that he would testify that he knew the nature of the paper or would state more explicitly his opinion of the capacity of the deceased to make a will. Counsel for the proponent also stated that the superintendent of the hospital and another nurse, who relieved the nurse already referred to, would testify that though the deceased "had at times a drowsiness that anybody would have had that had this particular disease" there was nothing that "would in any way show her as incapable of having the mentality that it required to make a valid, testamentary disposition." Counsel for the proponent stated that the lawyer who drew the alleged will would testify that at the Amesbury Hospital the deceased gave some instructions for its preparation, and she was then "bright, and there was nothing the matter with her mentality that he could see," and that at the hospital in Boston she gave him further instructions stating her reasons for the disposition of her estate. This lawyer would testify further that he followed such instructions and that when he had drafted the will she "read every word" of it and "apologized for taking so long." There was also a statement that the third witness to the will would testify that at the time of its execution the lawyer asked the deceased if she wished him to witness the will, that she replied that she did, that the will was executed in due form, and that "the woman knew what she was doing."

It is apparently undisputed that at times the deceased did not have mental capacity to make a will and this case presents the issue whether the instrument in question was signed during an interval when she had such capacity. See *Daly* v. *Hussey,* 275 Mass. 28, 29. We can hardly say that, giving due weight to the decision of the probate judge, on the expected evidence as stated by counsel involving some conflicts of testimony and of expert opinion, the decision that there was a genuine question of fact on the issue of sound mind was erroneous. See *Needham Trust Co.* v. *Cookson,* 251 Mass. 160.

2. It was error to frame an issue relating to fraud or undue influence.

The burden of proving fraud or undue influence was on the contestants. *Hogan* v. *Whittemore*, 278 Mass. 573, 578. Nothing in the expected evidence as stated tended to show fraud as distinguished from undue influence on the part of George L. Briggs and A. Lester Rundlett, or either of them. And no further discussion is required to show that there was at least a genuine issue of fact as to the susceptibility of the deceased to influence by reason of her physical and mental condition. A person may be specially susceptible to influence even if of testamentary capacity. *Becker* v. *Becker*, 238 Mass. 362, 366. And undue influence need not be proved by direct evidence, but there must be more than suspicion. *Hoffman* v. *Hoffman*, 192 Mass. 416, 419.

Though George L. Briggs was named as an executor in the earlier instrument and was a devisee in remainder of real estate given thereby to the uncle of the deceased for life, and though there are statements of expected evidence that he had known the deceased practically all her life and had been "her man of business, so far as her property holdings in Amesbury were concerned," the expected evidence does not place him in a highly confidential relation to her. It falls short of the evidence in the cases of which *Eddy* v. *Eddy*, 281 Mass. 156, 161, and *Wellman* v. *Carter*, 286 Mass. 237, 248, are examples. And the expected evidence does not show a highly confidential relation between Rundlett and the deceased. He was her chauffeur and for about two months had filled out checks for her signature, cashed checks for her and attended to her daily business affairs. The expected evidence does not show that either Briggs or Rundlett had previously exercised any influence upon the deceased.

Expected evidence stated by counsel for the contestants tending to connect Briggs and Rundlett with the making of the alleged will is as follows: Briggs saw the deceased at the Amesbury hospital and she recognized him. Rundlett was in the deceased's room at the Amesbury hospital on April 17 and later brought to that hospital a lawyer who had never done any legal business for the deceased. This lawyer spent some time with the deceased in the eve-

ning. When he left he told the nurse that the deceased "could not decide about the most important thing that he had talked to her about." When the nurse notified Rundlett from Boston that it would be all right to bring the lawyer there, Rundlett went to the hospital with the lawyer and Briggs accompanied them. Mrs. Finnegan would testify that she was there and heard Briggs say to Rundlett, "You keep out of sight. When I want you I will call you," and that Rundlett told her that the lawyer was associated with Briggs in the real estate business. (This was not true.) She would also testify that on the previous day she spoke to Rundlett of money lent by her to the deceased and he said "Yes, I tried to get that in somehow so you would get it." The lawyer went into the deceased's room and stayed with her some time. The nurse would testify that he said to her, "I am glad you came in. Perhaps we can bring the matter to a head now." Briggs began looking for witnesses and found a friend in the hospital who witnessed the will. There was no statement that Briggs was in the deceased's room when the will was executed. The nurse would testify that Rundlett several times told her that the lawyer was not drafting a will.

The expected evidence as stated by counsel for the proponent tends to show that the deceased when she was at the Amesbury hospital sent her chauffeur, Rundlett, for Briggs and for a lawyer, that Briggs went to the hospital but did not see the deceased because she was just about to be taken to Boston, that Rundlett, on hearing from the nurse, brought Briggs and the lawyer to the hospital in Boston where the will was prepared by the lawyer according to instructions of the deceased and was executed, and that Briggs had nothing to do with the execution of the will and was not in the deceased's room at the hospital until after the will was executed.

Though both Briggs and Rundlett would benefit under the alleged will, and expected evidence has some tendency to show that the deceased was susceptible to influence, that Rundlett had opportunity to influence her directly and, perhaps, that Briggs had opportunity to influence her in-

directly, through a concerted plan with Rundlett carried out with the aid of the lawyer, we think that there is no such substantial expected evidence of undue influence actually exercised upon the deceased by either Rundlett or Briggs, directly or indirectly, as warrants the framing of any issue relating to undue influence. See *Eddy* v. *Eddy*, 281 Mass. 156, 161. See also *Smith* v. *Brewster*, 247 Mass. 395; *Harvey* v. *Knapp*, 270 Mass. 354; *Sheppard* v. *Olney*, 271 Mass. 424; *Bacigalupo* v. *Cuneo*, 277 Mass. 474; *Smith* v. *Patterson*, 286 Mass. 356, 360–361.

It follows that the order of the Probate Court must be affirmed to the extent that it frames an issue relating to the soundness of mind of the deceased, but must be reversed to the extent that it frames an issue relating to undue influence.

*Ordered accordingly.*