SAMUEL B. DOGGETT *vs.* EMMA MORSE.

Suffolk.    January 5, 1938. — February 2, 1938.

Present: RUGG, C.J., DONAHUE, QUA, DOLAN, & COX, JJ.

*Probate Court,* Jury issues.   *Undue Influence.*

The denial of a motion for a jury issue as to whether a residuary legacy to one named as executor in the will of an aged woman was procured by undue influence on his part was reversed on appeal where statements of expected evidence were to the effect that the executor-beneficiary

was the trusted adviser of the testatrix and had managed her property and affairs, and of a course of conduct on his part that would warrant a conclusion of undue influence, although there was no offer to show specific acts of his at the time the will was made.

PETITION, filed in the Probate Court for the county of Suffolk on June 23, 1937, for proof of the will of Maud M. Morse, late of Boston.

The sole next of kin of the alleged testatrix, Emma Morse, moved that an issue be framed for trial by jury as follows: "Was the execution of said alleged will of said Maud M. Morse, procured by the fraud or undue influence of Samuel B. Doggett or Brewster D. Doggett or any of them, exercised upon the said Maud M. Morse?" At the hearing of the motion counsel for the respondent orally stated in substance that she had no objection to any part of the will except "Article 19, which is the residuary clause." The motion was denied by *Dillon*, J. The respondent appealed.

*B. Saunders,* (*E. K. Bowser* with him,) for the respondent.
*F. G. Arey,* for the petitioner.

Cox, J. This is an appeal from an order of a judge of probate denying a motion for the framing of an issue for a trial by jury concerning an instrument, dated March 26, 1937, offered for probate as the last will and testament of Maud M. Morse. The proposed issue relates to undue influence on the part of Samuel B. Doggett, who is named in the instrument as executor and residuary legatee. The only issue raised by the contestant is as to the nineteenth or residuary clause. The case was heard on statements, which are reported, made by counsel of the respective parties as to the evidence which they expected to offer if there should be a jury trial.

The governing principles of law need not be restated. See *Cranston* v. *Hallock*, 281 Mass. 182; *Smith* v. *Patterson*, 286 Mass. 356; *Terry* v. *King*, 286 Mass. 598.

The decedent, who was never married, died on June 19, 1937, at the age of about eighty. She had worked in the Boston Public Library until about 1923. Her mother, who had kept a lodging house in Boston and with whom the decedent lived, died in 1926. It was estimated that after

the mother's death the decedent had about $13,000. The proponent Doggett, to whom the rest and residue of the decedent's property was given provided he was living at her death, offers to show that at the time of her mother's death the decedent appealed to him for financial assistance, saying that she was in need, and that he helped her out and took care of the funeral bills. The decedent had an aunt, Mrs. Upham, who was very wealthy, and Doggett offers to show that he arranged so that the decedent went to live with her aunt and "he gave her a position as housekeeper." In 1927 the decedent made a will in which Doggett was named executor. In it she provided for several small bequests and two of $5,000 each for the Widows Society and the Home for Aged Men. The residue of her estate was left to five charities. In 1935 she made another will which, besides leaving several small bequests, gave $5,000 to the Widows Society, $1,000 each to the Home for Aged Men and two other charities, and all the rest and residue to Doggett, with the request that he "pay out of the same certain sums of money to those whom" the decedent should "from time to time by a request in writing direct, . . . but these requests" were not "intended as part of my will, and not intended to impose any obligation whatsoever." The specific bequests amounted to $10,600.

Mrs. Upham, the aunt, died on February 21, 1937. By the terms of her will the decedent was given all her personal and household effects which were inventoried at about $10,000. Doggett was given $200,000 in trust to pay the net income to the decedent so long as she lived. The trust provided for the payments of income "to be made to her or in the absolute discretion of the trustee to be applied for her benefit." Doggett also received under this will as trustee the residue of the estate to be held for the benefit of the decedent. Among the powers of the trustee was "the full power to decide, without any hearing or consultation with the beneficiaries as to what is capital and what is income." The annual income of the decedent after the death of her aunt is stated to have been between $40,000 and $50,000. It is stated in behalf of the contestant that the

decedent was a person of indecisive bearing and of little familiarity with business matters, but this is controverted by the proponent. After the death of Mrs. Upham, Doggett called nearly every day at the decedent's home down to March 26, 1937, when the instrument now presented for probate was executed. It was not disputed that Doggett had charge of the business affairs of the decedent in addition to his duties as trustee under the Upham will and had possession of all her property.

Statements are credited to the decedent to the effect that on one occasion, when she was told that she should not sign papers unless she read them and knew what was in them, she replied, "Mr. Doggett tells me to sign them and I have got to sign them," and that she said that Doggett had influenced her in a great many things and she "felt she should do something about it"; that she did not know the amount of money she was entitled to receive from the Upham estate; and that on one occasion, when she asked Doggett if she could not have a small amount of money with which to purchase some dresses for herself, he told her that she could not afford it and suggested that she have Mrs. Upham's clothes made over. It is represented that she said she had requested Doggett to tell her what he had done with her money and that he refused to give her this information; that he kept her in the dark about financial affairs; that she had signed all kinds of papers of which she did not know the contents, and would like to have someone to help her out; that she had no one with whom she could talk about her financial affairs; and that, in referring to Doggett, she said, "He keeps taking my money and will never tell me what he is doing with it and when I ask about it he says, 'Never mind, I will tend to that.'" Other statements attributed to her tend to indicate that Doggett, when requested to make expenditures on her account or to furnish her money for the same, told her that she could not afford them or that she would have to wait until later for them.

Up to the time of Mrs. Upham's death the decedent had been attended for about twenty-five years by a Dr. Evans, who was also her close friend. He also had treated her

mother. At the death of Mrs. Upham, Doggett employed a Dr. Dixon to attend the decedent. The decedent objected to this, and told one of the servants that she wanted Dr. Evans and that Doggett would not let her have him and insisted on Dr. Dixon attending her. Doggett is reputed to have said, when this matter was brought to his attention, that he felt "Miss Morse should have two doctors, one for her and one to keep an oversight for me." In some way this matter came to the attention of Mr. Arey, who drew all of the decedent's wills, and thereafter Dr. Evans resumed his attendance upon the decedent. On the other hand, it is contended by the proponent that Dr. Dixon had attended Mrs. Upham for a long period of years and that Doggett's suggestion was that Dr. Dixon drop in occasionally to see her; that there was no intention to discharge Dr. Evans; and that the whole matter was the result of a misunderstanding.

The contestant states that at the death of Mrs. Upham Doggett took entire charge of the household, discharged some of the employees and retained others at reduced salaries, telling them that this was necessary inasmuch as the decedent did not have much money. On the day the decedent was expected to arrive at the home of Mrs. Upham after Mrs. Upham's death, the cook told Doggett that there was no food in the house, to which Doggett is alleged to have replied that it would not be necessary for her to buy any food for the present, that bread and butter, apple sauce and tea would be ample for the evening meal, and that there was too much milk and cream being used while Mrs. Upham was alive. He gave instructions to the cook as to the purchase of food, telling her to submit the bills to him for his approval. Doggett paid all the bills of the household. There were other representations to the effect that he had charge not only of all of the decedent's financial affairs but also of the details of her every day life.

The relations between Doggett and Mr. Arey are friendly, Mr. Arey occupying an office in the Doggett building and being his attorney. The proponent offers to show through Mr. Arey, who is left $500 by the instrument in question,

that at the time it was drawn, the decedent came to Mr. Arey's office and went over "this" material "and then she went in and talked it over with Mr. Doggett. We drew the work-sheet on this and it was submitted to Miss Morse and she wanted one little change. She had that one or two days, and she wanted one little change made. Mr. Doggett called me and said that they had made another little change in the will and she wanted another will, and I said, 'I am very busy, I will be glad to take it out and have it done,' and Mr. Doggett got the copy and got the suggestions of the change and took them to his own house and that night typed them off on his own typewriter. They were returned and Miss Morse had that will one day in her possession." The decedent asked that Doggett take care of the will. On the day that it was signed, Doggett went to her house, and he and the decedent went to a branch of the First National Bank which was nearby, where the will was executed. Doggett took it away with him. From the proponent's offer it would appear that the decedent was well known at the bank and that the witnesses to the will all knew her; that she stated that it was her will. The specific bequests in the will amount to $18,200, and the residue of her estate is given to Doggett with the provision that, if he should predecease the decedent, then the residue should go to Doggett's son (who, it is alleged, was disliked by the decedent), the decedent reserving the right to make certain bequests out of the residue by notifying Doggett in writing of such desire, but these suggestions were not to be in any way obligatory as to the final disposition of the remainder of her estate, and were not intended to be a part of her will or to impose any obligation whatsoever. Doggett is named executor. The residue is estimated as amounting to about $31,000.

On May 14, 1937, seven weeks after the instrument in question was executed, there was filed in the Probate Court a petition purporting to be signed by the decedent for the appointment of a conservator for her. This was drafted by Mr. Arey and requested the appointment of Mr. Arey and Doggett's son, Brewster, as conservators. The grounds for the appointment, as stated in the petition, were that the

decedent "has become incapacitated by reason of advanced age — mental weakness." No citation ever issued on this petition, nor was any decree ever entered thereon.

Several letters from the decedent to the contestant, the last being dated June 10, 1936, appear in the record, and from these and other proposed testimony it would appear that their relations were friendly and that the decedent was solicitous for the contestant's welfare. The contestant is a cousin and the only heir at law of the decedent.

The proponent concedes that the decedent depended on him to a great extent for any suggestions, but maintains that these suggestions were limited to the care of the personal estate of the decedent which she had asked him to invest for her. Doggett is not an attorney. There are other offers to show that the decedent sought Doggett's advice and help on several occasions and that she was very grateful to him for his many kindnesses.

The decision of the probate judge in a case of this kind is entitled to weight even though the entire record is before us. *Hannon* v. *Gorman*, 296 Mass. 437. But we are led to the conclusion that in the circumstances disclosed an issue of undue influence of Samuel B. Doggett should have been framed. It is true that he is not an attorney and that he did not make the final draft of the instrument in question, and while the court may appear more zealous in its scrutiny of what amount to business dealings between an attorney and client, nevertheless, where an existing relationship of trust and confidence is shown between a beneficiary and testator, the general conduct of the beneficiary toward the testator and his acts with reference to the making of the will generally call for a searching examination. *Jones* v. *Simpson*, 171 Mass. 474. *Hayes* v. *Moulton*, 194 Mass. 157. *Bessom* v. *Bayrd*, 282 Mass. 58. And all to the end that the court may "not grant probate without entire satisfaction that the instrument does express the real intentions of the deceased." *Baldwin* v. *Parker*, 99 Mass. 79, 87. The conduct of a trusted advisor prior to the making of a will in which he is named as beneficiary may be such as to amount to undue influence voiding the will, without proof of specific

acts of the advisor at the time the will was made. *Davenport* v. *Johnson*, 182 Mass. 269. On this record we think enough appears to require us to reverse the order. An order is to be entered framing an issue on the undue influence of Samuel B. Doggett.

*Ordered accordingly.*