WILLIAM J. FOLEY *vs.* ALICE G. PHILBROOK & others.

Norfolk. May 5, 1938. — May 26, 1938.

Present: RUGG, C.J., LUMMUS, QUA, DOLAN, & COX, JJ.

*Probate Court,* Jury issues. *Unsound Mind. Undue Influence.*

Allowance of a motion for a jury issue as to soundness of mind of an alleged testatrix was not required where statements by contestants were of expected evidence general and remote in character, while the proponent presented affidavits of attending physicians clearly indicating mental and physical health for the years immediately before and after the alleged will was made.

The granting of a jury issue as to undue influence which procured the making by a woman of a will excluding next of kin, cousins with whom she was not on terms of intimacy, in favor of one who for years before and after the making of the will had been her confidential

business adviser, was not required by a statement of expected evidence by the contestant showing no more than that the proponent had an opportunity to exercise undue influence, opposed by the proponent's statement and evidence of previous wills, drawn by her counsel of long standing, consistently favoring the proponent.

PETITION, filed in the Probate Court for the county of Norfolk on June 10, 1937.

A motion by Alice G. Philbrook for jury issues was heard by *McCoole*, J., and was denied. The contestants appealed.

*T. C. O'Brien*, (*J. E. Keefe, Jr.*, with him,) for the respondent Philbrook.

*G. J. Culhane*, for the petitioner.

DOLAN, J. This is an appeal from a decree entered in the Probate Court for the county of Norfolk denying a motion that jury issues be framed in the matter of the petition for probate of an instrument purporting to be the last will of Kate S. Gallaher (hereinafter called the deceased), late of Brookline in said county, who died on May 29, 1937. The contestants are four first cousins of the deceased who are alleged in the petition for probate to be her heirs at law. The motion was heard on statements of counsel and certain documentary evidence. The instrument offered for probate was executed on December 21, 1934. By its terms pecuniary legacies of $4,000 and $3,000, respectively, are given to two persons described as cousins, and $2,000 and $1,000, respectively, to two persons described as friends. No provision is made therein for the contestants, and the fifth paragraph of the instrument reads as follows: "For good and sufficient reasons I purposely omit to make any bequest or devise to any and all other relatives of mine." The residue of the estate of the deceased is devised and bequeathed to the proponent.

The motion for jury issues was that issues be framed whether the instrument was executed according to law, whether the deceased at the time of its execution was of sound mind, and whether its execution was procured by the fraud or undue influence of Margaret V. Foley and William J. Foley (the proponent), or either of them, exercised upon the deceased.

No statement was made by the contestants as to any expected evidence bearing upon the due execution of the instrument. The judge properly refused to frame that issue. It would serve no useful purpose to recite in detail the contestants' statements of expected testimony bearing on the issue as to sound mind. They were general in their character, consisting of statements that over a period of years the deceased suffered from arteriosclerosis; that physicians (generally) are of opinion that arteriosclerosis is a degenerative process which is progressive and affects the mentality of those so afflicted; that at a period remote by nearly twenty-five years the deceased had a nervous breakdown; and that after her sister died in 1918 the deceased was hysterical for months and constantly overwhelmed by paroxysms of grief. Such general statements of alleged conditions, for the most part so remote as to require their exclusion in evidence, would be insufficient to warrant the framing of an issue as to the soundness of mind of the deceased at the time of the execution of the alleged will. Moreover this statement by the contestants was overborne by the proponent's statement of expected testimony of physicians who attended the deceased from 1927 to the time of her death, supported by their sworn statements in writing which were read into the record, to the effect that during all that period up to a few days before her death the deceased was "of sound mind with a complete mental grasp" of all that went on; that she was almost brilliant, was keen, of excellent memory; that up to her last illness in May, 1937, she was "a very well woman both mentally and physically," had no physical defects, and had "high mentality"; that she died of pulmonary congestion which was followed by cerebral thrombosis; and that both of these conditions were acute and not of long standing and could not have had any effect on her mentality prior to their inception, which was about May 15, 1937, when she called at the office of one of the physicians and complained of not feeling well. The issue as to the soundness of mind at the time of the execution of the alleged will was properly denied.

The contestants' statement of expected testimony bearing on the issue of whether the execution of the alleged will was procured by the fraud or undue influence of Margaret V. Foley and William J. Foley (the proponent) or either of them, exercised upon the deceased may be summarized as follows: The contestants stated that they expected to prove that the deceased, who never married, was engaged for many years in conducting a fashionable dressmaking shop with her sister; that through thrift and industry they had accumulated about $100,000 before 1913; that they had made several investments in real estate, and in 1914 invested practically "their all" in real estate consisting of a block of stores and a garage at Coolidge Corner in Brookline, for which they paid $165,000, giving back a mortgage to the seller for $85,000; that in 1918, following the death of the sister of the deceased, the "Foleys" were first found occupying a place in the life of the deceased; that from that time to the death of the deceased the family of the proponent were almost constantly in the company of the deceased; that during this period advice and counsel were offered and accepted by the deceased from the "Foleys"; that in 1925 a real estate agent who had been caring for the Coolidge Corner property received an offer for the purchase of the property, which he submitted to the deceased; that she rejected this offer, telling the agent that she had consulted a person in whom she had confidence and who had advised her not to accept the offer; that the deceased was dissuaded from accepting this offer by the proponent; that the agent offered the deceased $20,000 a year for a twenty-year lease of the premises; that she never notified the agent either of the rejection or of the acceptance of this offer, but that in June, 1925, he learned that the premises had been leased to another real estate concern for $33,000 a year for a period of twenty-five years; that in April, 1925, she purchased a house in Cohasset, the title being taken in the name of the proponent; that she lived in this house during the summer periods, with the proponent, until her death, the help and chauffeur being employed by her; that on October 7, 1925, the deceased executed a power of attorney

to the proponent, under authority of which he discharged a mortgage on her old home on December 15, 1925; that the power of attorney was unlimited; that the proponent was exclusively in charge of the deceased's affairs from 1925 until her death; that in March, 1930, the mortgage on the Coolidge Corner property was increased from $85,000 to $125,000; that in 1932 there was trouble over the lease with the lessees of that property; that the latter assigned the lease to a brother of the proponent as a straw; that three of the stores in the property were occupied by the proponent in various enterprises; that he paid no rent; and that no books of account were kept of his business transactions on account of the deceased.  The contestants conceded that the parents of the proponent were friendly with the parents of the deceased fifty years ago, but stated that for a period of thirty years up to 1918 the "Gallahers and the Foleys had no social intercourse"; that Margaret V. Foley (alleged to have exercised undue influence upon the deceased) accompanied the deceased on a trip to Europe, and on another occasion on a trip to Florida; that from 1920 until the death of the deceased it was most difficult for anybody to talk with her unless one of "the Foley family" was present.  Other statements of expected proof relating to statements of the deceased at a period more than fifteen to twenty years before her death need not be referred to.  They are too remote.  The contestants made no statement of expected evidence tending to show any intimacy in their relations with the deceased.  One of them lives in Maine, the other three live in Georgia.  The only statements made by the contestants concerning their relations were that the deceased was "proud of her relatives in Georgia" and had a deep affection "for her first cousin, Mrs. Philbrook, who lived in Portland, Maine."  The contestants also stated expected testimony of one witness tending to show that in 1923, 1925 and 1927 the deceased made statements that she did not seem to be mistress of her own affairs, and that the proponent insisted that he was her nearest relation and she must leave all her property to him.  It is clear that the contestants' statements of expected testimony would not

warrant the framing of the issue of undue influence as against Margaret V. Foley.

The proponent made statements of expected testimony tending to show that the instrument offered for probate was prepared by a lawyer of high standing at the bar from instructions given him by the deceased, personally, on an occasion when she went to his office unaccompanied; that for twenty-five or thirty years he had been her legal adviser; and that under her instructions he had drawn prior testamentary instruments in 1923 and 1925. The 1925 instrument and a carbon copy of the 1923 instrument were offered in evidence. Under the instrument of 1923 pecuniary legacies of approximately $60,000 were given to charities, friends, and certain persons described as cousins of the deceased, and there was a bequest of $1,000 for the care of her burial lot; the residue was given to the proponent, who was described as a cousin. No provision was made in this instrument for any of the contestants. The instrument executed by the deceased under date of October 2, 1925, contained pecuniary legacies totalling $41,000 to persons described as cousins and friends and a bequest of $1,000 for the care of her burial lot, and devised and bequeathed the residue to the proponent, who was again described as a cousin of the deceased. Other statements of expected testimony made by the proponent may be summarized as follows: that the counsel who prepared the testamentary instruments just referred to would testify that the proponent had not seen him in connection with nor discussed with him the subject of any will of the deceased; that other witnesses would testify that on numerous occasions the deceased had stated that she had made her will several times but had to change it because people had died to whom she had made bequests, and that this was the fact; that the deceased spoke to friends "more about the Foley family" than about anyone else; that as she was about to take a trip "around the world" she stated to a friend "If anything happens to me I want everything I have to go to Bill Foley. He has been good to me . . . I couldn't manage all my business affairs myself and when other

people managed my affairs I always had trouble until Bill Foley took it over"; that in fact the parents of the proponent and those of the deceased had been lifelong friends; that while the proponent was not related to the deceased by blood, he was related to her by marriage; that in 1919 he was seriously injured at his work in Lawrence, Massachusetts; that the deceased visited the "Foley home" almost daily; that she urged the proponent to adopt a less hazardous occupation; that in 1920 he came to Boston and engaged in the mortgage business there, until requested by the deceased to move into one of the vacant stores in her Coolidge Corner property; that he did so move; that the Cohasset home referred to by the contestants was in fact that of the proponent; that the deceased lived there with his family in the summer seasons; that the refusal of the offer to take a lease of the property at Coolidge Corner at a rental of $20,000 was advised by the deceased's attorney; that the proponent negotiated the lease of the premises for a much larger sum; that the refusal of the offer for the purchase of the real estate was likewise advised by her counsel, who pointed out that substantial taxes would be payable because of the "enormous" profit gained over the purchase price, and advised a long term lease; that the power of attorney referred to by the contestants was executed in 1925 as the deceased was leaving for Europe, and was given because during her absence the mortgage held by her on her old home was coming due; that the assignment of the lease of the Coolidge Corner property to the brother of the proponent was in accordance with the advice of the deceased's counsel; that the deceased was always available to those who wished to see her; and that she lived her own life as she pleased, travelling frequently abroad and to Florida.

The contestants urge that, in the circumstances expected to be proved by them, as the proponent was the trusted business agent of the deceased, thus occupying a fiduciary relationship toward her, his general conduct toward her and his acts with reference to the making of the alleged will generally call for a searching examination. That

principle is well settled by many decisions, such as in the cases of *Tarr* v. *Vivian*, 272 Mass. 150, and *Doggett* v. *Morse*, 299 Mass. 383, upon which the contestants rely. We are of opinion, however, that the facts in those cases are clearly distinguishable from those expected to be proved in the case at bar. In the present case the prior testamentary instruments executed by the deceased give evidence of a long cherished intention so to provide for the proponent. Those instruments and that offered for probate were drawn by her counsel of long standing upon her sole instruction. The instrument of 1923 was executed by the deceased before the proponent took charge of her property. There is no statement of expected testimony that he ever discussed with the deceased her testamentary intentions or dispositions. No statement is made of any expected testimony of statements or conduct on the part of the proponent tending to show that he "'possessed or attempted to exercise . . . any domination over . . . [the] testamentary disposition' of the deceased. *Neill* v. *Brackett*, 234 Mass. 367, 374." *Walsh* v. *McGrenery*, 299 Mass. 153, 155, and cases cited. The contestants' statement tends to show no more than opportunity to exercise undue influence, which is not enough. "The adverse decision of the probate judge in whom is vested an element of discretion in such matters is entitled to weight." *Walsh* v. *McGrenery*, 299 Mass. 153, 155. See also *Clark* v. *McNeil*, 246 Mass. 250, 255; *Hannon* v. *Gorman*, 296 Mass. 437; *Doggett* v. *Morse*, 299 Mass. 383, 389; *Duncan* v. *Huffam*, *ante*, 300. A searching examination of the record does not satisfy us that the judge erred in refusing to frame the issue of undue influence.

*Decree affirmed.*