OLD COLONY TRUST COMPANY *vs.* GERTRUDE PETERS YONGE & others.

Norfolk.    December 6, 1938. — December 29, 1938.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, & RONAN, JJ.

*Undue Influence.    Will,* Validity.

A finding that a will of a widow seventy-five years of age and of impaired mental faculties was procured to be made by undue influence of a much younger man who was not related to her and had been a stranger to her until shortly after her husband's death and three years before the will was made just previous to her death, was not plainly wrong on evidence that he had opportunities to exert such influence, that she had given him increasingly extensive gifts including large ones at or about the time of the making of the will, that the terms of the will, which gave him the bulk of her property, were wholly inconsistent with three previous wills, and that the will was drawn by an attorney procured by him and was executed without advice from her regular attorney.

PETITION, filed in the Probate Court for the county of Norfolk on June 15, 1937, for probate of the will of Gertrude E. Browne, late of Brookline.

After hearing by *McCoole,* J., the petition was dismissed. The petitioner appealed.

*N. Leonard, (J. H. Choate, 3d,* with him,) for the petitioner.

*R. G. Dodge, (R. I. Hunneman* with him,) for the respondents.

RONAN, J.    Gertrude P. Browne died on May 28, 1937, at the age of seventy-five years, possessed of an estate of approximately $50,000, and leaving as her heirs two nephews and two grandnieces.    Three of these appeared in opposition to the probate of an instrument purporting to

be her last will and to have been executed by her on May 12, 1937, which, after a full hearing in the Probate Court, was disallowed on the ground, as stated in the decree, that it had been procured by the undue influence of one Rossiter. The proponent appealed from the decree of the Probate Court.

The case is before us with a full report of the evidence but without any findings of fact by the judge other than the recital in the decree to which we have just alluded. Appeals from the Probate Court under G. L. (Ter. Ed.) c. 215, §§ 9–12, are considered in this court in the same manner as are appeals in equity. *Norcross* v. *Mahan*, 283 Mass. 403. *Greeley* v. *O'Connor*, 294 Mass. 527. *Murphy* v. *Donovan*, 295 Mass. 311. It is our duty to examine the evidence and to decide the case upon our own judgment but the findings made by the judge upon oral testimony are not to be set aside unless they are plainly wrong. *Tuells* v. *Flint*, 283 Mass. 106. *Limoges* v. *Limoges*, 287 Mass. 260. *Murphy* v. *Nally*, 301 Mass. 329.

We have considered the evidence and shall now briefly refer to matters disclosed on the record. In 1934, following the death of her husband in October, 1933, Mrs. Browne moved into an apartment hotel in Brookline where she resided alone up to the time of her death. She had but a few friends who called upon her and whose visits she seemed to enjoy, but as time went on she became accustomed to leave word at the hotel desk that she was not to be disturbed and on such occasions her friends were unable to see her. She remained on friendly, but rather distant, terms with her relatives, none of whom saw her frequently, although a cousin had established an annuity of $1,800 for her, and his wife had made annual gifts of about the same amount. She seemed to be experiencing difficulty in properly adjusting herself to the situation in which she was placed by the death of her husband, to whom she was wont to refer. Soon after she arrived at the hotel, she met one Rossiter, a man considerably younger than herself, who was also living alone in the hotel and was employed in a furrier's shop in Boston. She became fond of him and

spent considerable time in his company. When she was away, they corresponded frequently and many of their letters are included in the record. A change in her mental condition became apparent in the fall of 1935. She was dazed and confused, and thereafter her interest in life began generally to wane. These conditions grew worse. Her memory was failing. At times she delayed doing simple things until she could concentrate sufficiently to enable her to act. She was unable to keep her check book in balance with the bank statement and turned this work over to a friend, who on May 1, 1937, was superseded by Rossiter. She began to use liquor much more than she previously had and at times showed its effects. From February 26, 1937, to March 14, 1937, she was confined to a hospital where she was treated for a septic leg. Soon after she returned from the hospital, it was suspected that she was suffering from a fatal ailment and on May 3, 1937, she entered a hospital for observation, where she remained until May 9, 1937. Her final visit to the hospital began on May 13, 1937. She commenced to give money to Rossiter in the spring of 1935 and these payments, some of which purported to be for merchandise, continued until May 5, 1937, when, while confined in the hospital, she gave him a check for $5,000. Rossiter within a day or two thereafter sought and secured a written statement from her physician that she was competent to transact business. On or about May 7, 1937, he had received a power of attorney from her to go to her deposit box, but this power was not recognized by the bank until one of its officials had conferred with Mrs. Browne, and then Rossiter removed the securities. On May 11, 1937, he made an appointment with an attorney who was a friend of his to come the next day to draft a will for Mrs. Browne. When the attorney arrived upon the afternoon of May 12, 1937, the securities, which Rossiter had taken from the deposit box, were placed in two piles upon the bed in which Mrs. Browne was. All the certificates in one pile were signed by her and delivered to Rossiter, and the attorney discussed with her and in the presence of Rossiter the amount and kind of prop-

erty she owned. When Rossiter left the room he took with him the certificates that she had signed. The attorney then continued to discuss her will with her and took notes. He then left the room, had dinner with Rossiter, wrote the will which gave Rossiter all her property except $900 and certain personal effects, and had it executed. It made provisions inconsistent with a general testamentary intent manifested by three previous wills and was contrary to her previous declarations to her friends. The attorney had also secured from her an order upon her regular attorney, whose family she had known for years and whose services were satisfactory to her, to turn over to him certain securities her regular attorney was holding for her. The evidence was conflicting concerning her mental condition and her attitude toward Rossiter. The case required the careful weighing of the oral testimony of numerous witnesses, some of whom furnished evidence which, if believed, would weaken or support the contentions of one side or the other. But the credibility of the witnesses was for the determination of the trial judge, and his failure to adopt a view of the evidence favorable to the proponent cannot be said to be error.

There was no direct evidence of any specific act of Rossiter in exerting coercion, duress, restraint or compulsion upon Mrs. Browne, nor is there contained in the record evidence of any definite instance where it was shown that contrary to her own judgment and volition she yielded and submitted to his express importunities, threats or commands. Proof of such a nature is not always available and resort must be had to all the attending circumstances, including the relationship existing between them, the mental vigor or infirmity of each, and the reasonableness of the act under investigation. The details of their association have been sufficiently narrated. The judge could find that Rossiter had no genuine friendship for Mrs. Browne; that he was actuated solely by mercenary purposes; that he began to receive more money as her mental faculties became more impaired and her physical condition more acute; and that finally his acts culminated in the receipt of $5,000, the

transfer of the stock and the execution of the alleged will. The judge could consider her infirmities, the character of her three previous wills manifesting a general testamentary intention to remember her relatives and friends and certain charities, while the instrument in question attempted to give the bulk of her estate to a comparative stranger who had come into her life only a few years before the execution of the will, for whom she was under no obligation to provide, and who had ample opportunity to exert undue influence upon her. He could also consider that she acted without independent and disinterested advice in executing an instrument which made provisions for meager legacies to those who were the natural objects of her bounty, and that from the time she entered the hospital, on the day succeeding the execution of the instrument, until her death, all visitors but Rossiter were barred. The existence of undue influence presented a question of fact depending almost entirely upon oral testimony. Upon this record we cannot say that the finding that the instrument was procured by undue influence was plainly wrong. *Davenport* v. *Johnson,* 182 Mass. 269. *Emery* v. *Emery,* 222 Mass. 439. *Neill* v. *Brackett,* 234 Mass. 367. *Raposa* v. *Oliveira,* 247 Mass. 188. *Angell* v. *Lighthipe,* 251 Mass. 525. *Crosby* v. *Tracy,* 290 Mass. 46. *Briggs* v. *Weston,* 294 Mass. 452. *Doggett* v. *Morse,* 299 Mass. 383.

The decree must be affirmed. The allowance of costs and expenses to parties or counsel, G. L. (Ter. Ed.) c. 215, § 45, is to be in the discretion of the Probate Court.

*Ordered accordingly.*