In re THE BIBLE SPEAKS, Debtor.

Elizabeth DOVYDENAS,
Plaintiff, Appellee,

v.

THE BIBLE SPEAKS,
Defendant, Appellant.

No. 88–1254.

United States Court of Appeals,
First Circuit.

Heard Oct. 4, 1988.
Decided March 9, 1989.

Norman Roy Grutman with whom Jewel H. Bjork, Grutman Miller Greenspoon & Hendler, New York City, Henry Paul Monaghan, Charles W. Morse, Jr., and Sullivan & Worcester, Boston, Mass., were on brief for defendant, appellant.

Marjorie Heins, Massachusetts Civ. Liberties Union Foundation, Boston, Mass., and Cynthia Salten on brief for the Civ. Liberties Union of Massachusetts, amicus curiae.

Lee Boothby, Julie B. Kaplan and Boothby, Ziprick & Yingst, Washington, D.C., on brief for Council on Religious Freedom and The Nat. Council of the Churches of Christ in the U.S.A., amici curiae.

Gordon T. Walker with whom Donald R. Frederico, Eric R. Dannenmaier, McDermott, Will & Emery, Boston, Mass., and Laurence H. Tribe, Cambridge, Mass., were on brief, for plaintiff, appellee.

Before BOWNES and BREYER, Circuit Judges, and BROWN,* Senior Circuit Judge.

BOWNES, Circuit Judge.

In this undue influence case, the defendant church, the Bible Speaks (TBS), appeals the district court's affirmance of the bankruptcy court's finding of liability. *See The Bible Speaks v. Dovydenas,* 81 B.R. 750 (D.Mass.1988) (*TBS II*); *In re The Bible Speaks,* 73 B.R. 848 (Bankr.D.Mass. 1987) (*TBS I*). The unique procedural history of the case was detailed by the district court.

TBS brought suit in Berkshire Superior Court [Massachusetts] against Elizabeth Dovydenas on April 14, 1986 seeking a declaratory judgment that it did not owe her any debt or liability and that it did not have to return funds transferred by her. This suit was dismissed on June 13, 1986. The Massachusetts Appeals Court dismissal was affirmed on April 8, 1987.

Elizabeth Dovydenas then brought suit on June 19, 1986 in Berkshire Superior Court against TBS. She sought rescission of gifts made by her between December 1984 and December 1985 because of undue influence and fraud. After its motion to dismiss was denied on July 15, 1986, TBS sought protection of the bankruptcy court filing for Chapter 11 reorganization on July 29, 1986. Its petition, which stayed the state court action, stated that Elizabeth Dovydenas' claim against it was a core proceeding. Elizabeth Dovydenas then filed a proof of claim with the bankruptcy court on October 31, 1986. The three-week trial on the merits began on March 30, 1987 and ended on April 16, 1987. The bankruptcy court issued its final order on May 19, 1987. By assuming jurisdiction of TBS over the claimant's objection, the bankruptcy court entered into the process of administering TBS' estate while it reorganized under Chapter 11.

81 B.R. at 753–54.

Plaintiff's claim in the bankruptcy court was for the return of gifts made to TBS, allegedly because of undue influence. The bankruptcy court found that the gifts were the result of undue influence and awarded her $6,581,356.25, which was the total of three large gifts and a number of smaller ones. After reviewing the record, the district court accepted and adopted in full the bankruptcy court's findings of facts. Both courts rejected the first amendment—free exercise claim of TBS.

We affirm in part and reverse in part.

## I. THE STANDARD OF REVIEW

The bankruptcy court made extensive findings of facts. *See TBS I,* 73 B.R. at 849–57. Credibility was a key factor in determining the facts. *Id.* at 857. We review the bankruptcy court's findings of fact under the clearly erroneous standard. Bankr.R. 8013;[1] Fed.R.Civ.P. 52(a).

In *Briden v. Foley,* 776 F.2d 379, 381 (1st Cir.1985), we held, in a bankruptcy case, that the clearly erroneous standard was especially appropriate where credibility was at issue, stating: "Indeed, the clearly erroneous standard was designed to insulate just such findings—ones that are based, *inter alia,* on weighing the credibili-

---

* Of the Fifth Circuit, sitting by designation.

1. Bankruptcy Rule 8013 reads in full:
   On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgement, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

ty of witnesses." *Id.* at 382. *See also In re Pearson Bros.*, 787 F.2d 1157, 1161 (7th Cir.1986). The clearly erroneous standard has been explained by the Supreme Court as follows:

Although the meaning of the phrase "clearly erroneous" is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles, as the Fourth Circuit itself recognized, is that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 [68 S.Ct. 525, 542, 92 L.Ed. 746] (1948). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*" *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 [89 S.Ct. 1562, 1576, 23 L.Ed.2d 129] (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 [70 S.Ct. 177, 179, 94 L.Ed. 150] (1949); *see also Inwood Laboratories, Inc. v. Ives Laboratories,*

*Inc.*, 456 U.S. 844 [102 S.Ct. 2182, 72 L.Ed.2d 606] (1982).

\* \* \*

When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. *See Wainwright v. Witt*, 469 U.S. 412 [105 S.Ct. 844, 83 L.Ed.2d 841] (1985).

*Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 575, 105 S.Ct. 1504, 1511, 1512, 84 L.Ed.2d 518 (1985).

We have reviewed the entire record carefully and conclude that the bankruptcy court's findings, including its credibility determinations, are not clearly erroneous. The bankruptcy court found the testimony of plaintiff and her husband "forthright and credible" and the testimony of defendant's witnesses "evasive and lacking in credibility." *TBS I*, 73 B.R. at 857. All credibility conflicts were resolved in favor of the plaintiff.

Because of our decision, *infra*, that the first amendment is not implicated in this case, we do not reach TBS' argument that its first amendment claim requires that we independently review the facts. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (free speech-libel case); *Bender v. Williamsport Area School Dist.*, 741 F.2d 538, 542 n. 3 (3d Cir.1984) (free exercise case), *vacated on other grounds*, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986).

## II. THE FACTS

At issue are three major gifts made by plaintiff to TBS in the amounts of $1,001,- 031.25, $5,000,325 [2] and $500,000 and a number of smaller gifts totaling $80,000. Because of the importance of the facts on

---

**2.** These two gifts will be referred to as the $1,000,000 gift and the $5,000,000 gift, respec- tively.

the issue of undue influence, we recite them in detail. Much of the testimony of the plaintiff was disputed, denied, or contradicted by Pastor Stevens, founder of TBS, and other members of TBS. Since the bankruptcy court found in favor of plaintiff, we state the facts in the light most favorable to her. Where there is a significant conflict between the plaintiff's testimony and those testifying on behalf of TBS, we have stated defendant's testimony in detail.

### The Parties

Elizabeth Dayton Dovydenas, the plaintiff, was born in 1952 and grew up in Minnesota. She is an heir to the Dayton–Hudson fortune. Jonas Dovydenas is a freelance photographer. Plaintiff met him in 1977 when he taught a photography class in Minnesota in which she enrolled. In December of 1978, they were married. Because plaintiff was so much wealthier than Jonas, they decided that he need not work in order to support them, but rather, he should concentrate on his art and family projects. Plaintiff had a fortune of approximately $19,000,000, most of which was held by Okabena, the family-owned investment company based in Minnesota. Prior to her gifts to TBS, plaintiff's charitable contributions averaged about $10,000 per year, with a high of $127,000 in 1977 to an art center.

In the Spring of 1981, Jonas and plaintiff moved to Lenox, Massachusetts. The move was unrelated to TBS—neither plaintiff nor Jonas knew of TBS at this time. They hired Irene Colby as a housekeeper; she happened to be a member of TBS.

After moving to Lenox, plaintiff was interested in joining a church. In 1982, after visiting a few which she did not like, she and Jonas went to TBS. They liked what they saw and heard and left a $500 check in the collection plate.

TBS was founded in 1971 in Maine by Carl Stevens with 35 to 50 members. Stevens has no formal Bible study training but he has been a Fundamentalist preacher for 26 years. TBS is organized as a non-profit organization with Stevens as its head. It has a 12 person Board of Trustees which must approve Stevens' decisions. In case of a deadlock, a group of elders decides the outcome of an issue. In 1976, TBS moved to its current location in Lenox, Massachusetts, having grown to approximately 800 to 900 members. As of 1987, there were approximately 1,300 members. A large campus was purchased with member contributions; it contained a children's school for grades K–12, a nursery and the Stevens School of the Bible. Stevens taught at the Bible School and preached at the Church. TBS also ran radio and television ministries as well as operating a missionary boat, *La Gracia*, in the Caribbean. It has a network of voluntary affiliates across the globe. In 1982, there were between 18 and 20 such affiliated churches. By 1987, that number had grown to about 100 with a world-wide membership of about 17,000. There are also about 160 missions in 26 countries.

### The Prelude

*Plaintiff's Testimony*

After the $500 check was left in the collection plate, Maureen Shea, plaintiff's new housekeeper and also a member of TBS (who was recommended by Colby when Colby left) [3] brought to the house two TBS pastors, Thomas Schaller and John Lloyd, who set a date for Pastor Stevens to come for tea. Sometime in the Winter of 1982–83, Stevens and Barbara Baum, Stevens' lady friend at the time (he later married her), did go to plaintiff's house for tea. At this time, Stevens asked plaintiff and Jonas if they had "accepted Christ" and both answered no. At this first meeting, when Stevens was alone with plaintiff, he asked her for money for a counselling center. She gave him a check for $2,000. Baum and plaintiff were the same age, and they became friends.

---

**3.** Each replacement or addition to plaintiff's staff was made by one TBS member recommending another.

Jonas' stay with TBS was brief. At one point he and plaintiff loaned (and later turned the loan into a gift) $50,000 for *La Gracia;* Jonas also spent some time on *La Gracia* photographing the boat and its missionary operations. Jonas' activity in TBS decreased as plaintiff's activity increased.

In the summer of 1983, plaintiff's and Baum's friendship blossomed as plaintiff began attending TBS services. One day while Baum and plaintiff were talking on TBS campus, plaintiff asked Baum about tithing and being born again. Baum took plaintiff to see Stevens without a prior appointment, which was unusual. The three conferred; Baum took notes for plaintiff. Stevens was told that plaintiff was born again but that Jonas was not. To this, he responded that plaintiff was saved and in the light and that Jonas was not saved and was living in darkness. On the subject of tithing, Stevens directed plaintiff to some Bible passages on the subject of giving and not withholding from God. Baum typed up the notes she had taken and gave them to plaintiff.

In September 1983, plaintiff enrolled in two classes at the Stevens School of the Bible. Stevens taught these classes which met Monday through Friday 8 a.m. to 9 a.m. and had an enrollment of about two hundred students. From 9 a.m. to 10 a.m., plaintiff attended a rap session led by Stevens which was also well attended but not as large as the class. Plaintiff was occasionally alone with Stevens in 1983. Late in 1983, Baum introduced plaintiff to Kathleen Hill, a member and employee of TBS and Baum's best friend. Plaintiff and Hill became friends.

In 1984, plaintiff became more involved in TBS activities and saw much more of Hill and Baum. Early in the year, Hill encouraged her to take charge of a women's seminar which was held in March. Plaintiff saw Hill and Baum frequently at lunch or TBS sponsored brunches. Plaintiff continued attending classes and rap sessions. She and Stevens also began

spending more time together.[4] She began accompanying him on his weekly Friday evening trips to Framingham, Massachusetts, where he preached at an affiliated church. Plaintiff's relationships with her non-TBS friends deteriorated as she spent more and more time with Stevens, Baum, and Hill.

In the period from November 1984 to April 1985, plaintiff saw Stevens alone on a daily basis: driving with him from class to rap sessions; seeing him at 11 a.m. after he finished with Telephone Time (a radio ministry); meeting with him in his office without a prior appointment; and driving with him to and from Framingham. Plaintiff testified that in these private meetings, she was given advice on religious, financial, and personal matters. She was told that she had to obey Stevens because he was the highest authority on earth. She was also told to listen to tapes of Stevens' speeches over and over and to take notes of all Stevens told her and then study those notes. She was to inundate her mind with Stevens' words. She disclosed her net worth to him, and he told her that her mission in life was to give and that her gifts could cause great events. Many discussions with Stevens, Baum and Hill focused on plaintiff's money and her giving it to others. Stevens told her that Jonas should get a job and that the family only needed $1,000,000 to live on. She was told not to listen to evil reports and that Jonas, his parents and her family were evil and were controlled by Satan and demons.

*Defendant's Testimony*

TBS' witnesses presented the following version of the same events. At trial, neither Schaller nor Lloyd were asked whether they set up the first meeting between Stevens and plaintiff; Stevens denied having sent them as emissaries. He did dine at plaintiff's house once at her invitation (Baum remembered twice). At this time, he asked if plaintiff and Jonas had accepted Christ; Jonas said no and plaintiff's response is unknown. Baum testified that

---

4. There has never been any suggestion that Stevens' and plaintiff's relationship was anything but platonic.

only Jonas was asked and she took his ambiguous response to mean "no." At this dinner, Stevens did not ask for or receive any money. He did not know that plaintiff was wealthy nor did he encourage the budding friendship between plaintiff and Baum because of her money. It was plaintiff who sought out Baum in the beginning of their friendship.

Stevens did not recall any meetings with plaintiff in 1983. Baum testified that the tithing and born-again conversation occurred in January 1984; Stevens also put the meeting at that time.[5] During the January meetings, they discussed Bible passages on tithing and giving as well as how to relate to Jonas. Stevens did not say that Jonas was a non-believer or that he was unsaved.

Stevens denied seeing plaintiff in 1984 except for class, rap sessions, group lunches and by appointment. He did not recall driving with plaintiff to Framingham until 1985. The women's seminar was plaintiff's idea. Baum saw plaintiff at least once a week, mainly for prayer sessions.

Stevens testified that at no time could plaintiff see him without an appointment. His day was too busy for anyone to do so, except for TBS pastors and emergencies. He never said that he was especially anointed by God or that he spoke the literal truth or that he was the highest authority on earth or that he must be obeyed. Rather, he said that he was God's man just like all preachers are God's men, that he was a sinner like all men and that he was only to be followed when he followed God. He also denied telling plaintiff, or any of his congregation, to fill their minds with only his words. He denied ever telling her that non-believers including Jonas and her family were evil, not to be trusted and controlled by demons. Nor did he say that she had a special calling to give or that her gifts could cause great events on earth. He never told plaintiff that Jonas should get a job or that all they needed to live on was $1,000,000.

## The $1,000,000 Gift

*Plaintiff's Testimony*

Baum and Stevens were engaged to be married in the Fall of 1984. Baum suffered from migraine headaches which regularly incapacitated her. Plaintiff was concerned about the headaches and their impact on the upcoming marriage. Stevens had been telling plaintiff that she was a special person who should give and to whom God could speak.

Plaintiff testified that in the Fall of 1984, before Stevens' wedding, while driving back from Framingham with him, she heard three things in her head, one of which was to give TBS $1,000,000. Shortly thereafter she had a discussion with Stevens; she told him that she was going to give TBS $1,000,000 and that she believed by doing so it *would* cure Baum's headaches. Stevens replied: "Great. I don't know which would be better, the million dollars or having her healed of her headaches." Plaintiff also told Hill and Baum of her intent to give the gift and her belief that it would cure Baum's headaches.

When plaintiff told Jonas about making the gift, he opposed it. Stevens told her to ignore contrary advice from Jonas or anyone else. Jonas contacted Okabena about the gift, and Okabena replied with a letter which detailed various options for giving TBS the money over longer periods of time and with more favorable tax consequences. On November 24, Baum and Stevens were married. The gift, in the form of a transfer of Dayton–Hudson stock worth $1,001,031.25, was completed in mid-December 1984.

On December 13, 1984, Jonas and plaintiff met with Stevens. At that meeting, Stevens said that he would not take any more money from plaintiff without Jonas' consent. After the $1,000,000 gift, Stevens, Baum, and Hill each told plaintiff that Baum's headaches were cured because of the gift. In fact, Baum continued to suffer from migraines but this was kept

---

**5.** Stevens' calendar shows two meetings with plaintiff and Hill in January. Stevens testified that Hill was detained with TBS work and that Baum filled in for Hill.

from plaintiff. Because she had been told by Hill, Stevens and Baum that Baum's headaches had been cured, plaintiff believed that large gifts by her to TBS could effect events on earth. In February and March 1985, Stevens emphasized to plaintiff the importance of obedience, the nearness of the end of the world and not listening to evil reports. In March and April, Stevens emphasized the ability of the holy spirit to control people.

*Defendant's Testimony*

TBS' witnesses presented a different version of these events. Baum's migraines were frequent and severe: she would either be bed-ridden or the pain on her face would be obvious. Stevens never told plaintiff that she had a special calling to give. In the Fall of 1984, Jonas told Stevens that plaintiff wished to give a large gift to TBS but did not tell him how much. On November 13, plaintiff told Stevens of the gift and its amount. At this time, she told him that after much prayer God had told her to give the money. Baum testified that plaintiff also told her that God had told plaintiff to make the gift. It was not until three weeks later that plaintiff told Baum that the gift *might* cure Baum's headaches; Baum told Stevens of plaintiff's statement. Hill was not informed of the link between the gift and the headaches until after the gift was completed. The ride from Framingham during which God spoke to plaintiff did not occur.

Stevens was not informed of Jonas' opposition to the gift until January 1985. The December 1984 meeting with Jonas was set up by Jonas to ask Stevens to contribute to a charity with which Jonas was involved. Stevens knew of the Okabena letter but never thought the gift was not freely made. Stevens denied telling plaintiff that she should ignore advice from Jonas or anyone else. He testified that what advice she got was up to her. In a January 2, 1985 meeting, Stevens learned of the marital friction developing between plaintiff and Jonas, but he did not tell her that

Jonas should get a job or that she should give more money to TBS. Until this meeting, he thought that Jonas agreed to making the gift and that the marriage was harmonious. Stevens denied seeing plaintiff except at services from then until March 1985. In the Spring, he gave a series of sermons on giving but these were not directed at plaintiff and dealt with spiritual gifts such as mercy and helps. Stevens denied ever telling plaintiff not to listen to non-TBS members.

Stevens, Baum and Hill all denied telling plaintiff that Baum's headaches were cured. Immediately after the gift was made, Baum did feel better for about three weeks, and plaintiff was told this. But, at a January 2, 1985 lunch, at which plaintiff was present, Baum was stricken with another migraine; although nobody told plaintiff that it was a headache, this fact was obvious to all who were present. No one specifically told plaintiff that the headaches had returned,[6] but, no effort was made to conceal that fact from her.

### The $5,000,000 Gift

*Plaintiff's Testimony*

In March 1985, plaintiff told Stevens that she had heard God tell her to give $5,000,000 to TBS in June. Stevens told her not to tell Jonas about this. In early April, she again discussed the gift with Stevens while Baum was present.

Plaintiff had planned a trip with Jonas and her children to Florida on April 18 for her mother's birthday. On the morning of the 18th, before she left for Florida, Baum called her. Baum told her that Ben Turkia, a TBS pastor, had been detained in Rumania and that "they're probably pulling his fingernails out right now." Baum requested that plaintiff pray for Turkia. Plaintiff proceeded to Florida as scheduled. Jonas left after a few days while plaintiff stayed for another week. Right after Jonas left, on the evening of Sunday April 21, plaintiff called Stevens. She told him that she wanted to give the $5,000,000 right away in

---

**6.** Baum offered contradictory testimony as to whether she ever actually told plaintiff that her headaches had returned: at first she said that she had not, but after a recess during which she talked to TBS' attorney, she said that she had.

order to effectuate Turkia's release, to which Stevens responded, "Great, get a jump on the devil." At this time, he did not tell her that Turkia had already been released. Stevens emphasized that she should not tell anyone, especially Jonas, about the gift. The next day, she wrote to Ron Gross at Okabena requesting that the gift be made as soon as possible. She did not discuss the gift with any outside advisors. Upon returning to Lenox, she met frequently with Hill and Stevens. Both cautioned her against telling anyone, including Turkia, that she had worked a miracle, though they assured her that she had.

There was a dispute as to who knew what and when about the events surrounding the Turkia incident. Prior to trial, an attorney for TBS stipulated that: 1. Turkia and a companion entered Rumania on April 16, 1985; 2. Turkia and his companion were detained at the border and interrogated; 3. they were released and returned to Austria via Budapest, Hungary on April 17; and 4. while in Budapest, Turkia called his wife in Baltimore and told her of both the detention and release—the call was made on April 17 late in the evening Budapest time (early in the evening Eastern time).

At trial, there was evidence that in April 1985, Mrs. Turkia was living on TBS campus. Turkia and his companion were detained on April 16, 1985 in Rumania. They were released on April 17, arriving in Budapest, Hungary that evening. His companion called a friend in Pennsylvania who was told to call Mrs. Turkia. The friend in Pennsylvania called Mrs. Turkia. Mrs. Turkia immediately called Pastor Schaller, who called Stevens and Baum. By April 18, Turkia was in Austria staying with friends. That evening, Mrs. Turkia called Austria twice. The first call was a short one to friends, but not to where Turkia was staying. The second was a twelve minute call to the house where Turkia was staying. Turkia returned to the United States on April 24.

The bankruptcy court refused to allow TBS to withdraw the stipulation. On a motion by plaintiff, it struck portions of Turkia's, Mrs. Turkia's and Schaller's testi-mony to the extent they conflicted with the stipulation. The court's finding does not rely exclusively on the stipulation, but is based also on portions of the testimony of the above witnesses. The court found:

> Turkia had been detained by Romanian border guards for only 24 hours, and had been released on April 17th. He arrived in Budapest, Hungary on April 17th at 8:00 P.M. Budapest time, at which point his companion placed a call to a friend in Pennsylvania informing him of what had happened and requesting him to call Turkia's wife. Turkia's wife was immediately informed of the detention *and release.* She was then living in Lenox in the home of Edward Canino ("Canino"), an employee of the Church.

*TBS I,* 73 B.R. at 852 (emphasis added). The court also found "that Stevens and Baum were aware of Turkia's release when they discussed the impending $5 million gift with the [plaintiff] over the telephone on the evening of April 21st." *Id.* at 863.

Upon her return to Lenox from Florida, plaintiff met with Stevens and Hill. At those meetings, strategy for making Okabena deliver the gift quickly and confidentially was discussed. Stevens and Hill told plaintiff what to say to Okabena; except for the first call, Hill was with plaintiff whenever she talked to Okabena. On April 27, 1985, plaintiff, Stevens, Baum, Hill and Hill's husband went to a restaurant. At that time, Stevens told her that her $5,000,-000 gift would be particularly influential in shaping the world for the return of God. Stevens also told plaintiff to write a letter to him and told her what to put in the letter. The next day, Hill dictated this letter to plaintiff who wrote it as she was told. The letter was given to Hill who gave it to Stevens. The letter stated that God had spoken to her, which was why she was making the gift, that no one from TBS had asked her for the gift or knew about it and that Stevens was to administer the gift.

On April 30, plaintiff's father called her because he had learned from his brother, an official at Okabena, of the proposed gift. In addition to inquiring about the

gift, her father told her that he was going to visit her. She told her father to call back later and immediately called Stevens who told her to come to his office. Once there, Stevens told her to tell her father that a much smaller amount was being given. She agreed to do so and told Stevens that Jonas would be there that evening and would overhear her talk with her father. Stevens called a TBS employee, Ed Canino, and told him to take Jonas out for a long dinner. That evening plaintiff disarmed her father and convinced him not to visit her. The gift was completed on May 13, 1985 by transferring shares of Dayton–Hudson stock worth $5,000,325 to TBS.

Stevens told plaintiff to get a post office box so that Jonas would not see any mail regarding the $5,000,000 gift or plaintiff's finances. She rented the box on April 30, 1985 and told Okabena to send all mail addressed to her there.

In late May 1985, after Jonas returned from a trip to Afghanistan, Hill, Stevens and plaintiff met. Hill suggested that Stevens write a letter to plaintiff and that plaintiff leave the letter for Jonas to find. Thereafter, Stevens wrote a letter to plaintiff stating that she should honor Jonas and seek his advice in major financial matters. Stevens also wrote that he thought Jonas loved his family and God. Plaintiff left the letter for Jonas to find. Despite what Stevens wrote, he told plaintiff not to trust or listen to Jonas because he was a non-believing husband.

### Defendant's Testimony

TBS' version of these events was again strikingly dissimilar. On March 19, plaintiff told Stevens that she was planning another large gift but she did not say how large. This meeting mainly concerned putting her son in a big brother program run by the Church. During the meeting, plaintiff also raised concerns about Jonas and his spendthrift ways. Stevens realized that there were serious problems when plaintiff said that Jonas was going to die because of

his demons. Stevens told her not to judge Jonas.

On April 11, Stevens met with plaintiff again. When she again stated that she wished to make a large gift, he asked her if the gift would harm her marriage, her family or her future security. She replied that it would not. Stevens was still not told how large a gift plaintiff was considering but gained some idea of the amount when plaintiff circled some items she wanted the gift to go toward. Because of TBS' policy against direct solicitation of gifts, Stevens asked plaintiff whether there had been a solicitation by any TBS member. Plaintiff responded that there had been no solicitation and that God had led her to give. She asked Stevens if he wanted this in writing and Stevens replied that he would.

Turkia is connected not only with TBS but also with other religious groups. The trip he made in April 1985 was for an organization unconnected with TBS.[7] Turkia was acquainted with plaintiff and Jonas because he had worked on plaintiff's estate cutting wood. Pastor Schaller told Stevens of the detention on April 16 or 17. Schaller had learned this from Mrs. Turkia who thought the friend in Pennsylvania had said that Turkia was still in custody and was facing a long prison sentence. Mrs. Turkia contended that she was unable to reach Turkia when she called Austria on April 18. As of the evening of April 21, the people at TBS still believed Turkia to be under Rumanian detention. On that evening, after regular services, a special prayer service was held for him. Stevens did not learn of the actual chronology until after Turkia returned. Schaller learned of Turkia's release between April 21 and 24 when he called the friend in Pennsylvania and learned of the miscommunication between Mrs. Turkia and the friend. He then informed Mrs. Turkia, Baum and Stevens of Turkia's release.

On April 21, plaintiff spoke to Baum and *not* Stevens. In that conversation, plaintiff did not say that she wanted to give the

---

**7.** This claim of no connection with TBS is undercut by the fact that TBS wrote a $1,000 check    to Turkia's travelling companion in June 1985.

gift earlier in order to save Turkia but rather, she wanted to give earlier as an inspiration from Turkia. Upon Turkia's return and at all times thereafter, nobody at TBS attempted to hide the actual chronology from plaintiff and no one ever told her that her gift had caused Turkia's release. Plaintiff was not prevented from discussing the events with Turkia when he was in Lenox.

As to when Stevens knew of the amount of the gift, he and other TBS pastors testified that it was not until after the Turkia incident was concluded.[8] They said that several large gifts were being discussed during this time frame. Stevens learned of the amount when he received plaintiff's letter on April 28. Stevens did not request that letter except as noted above and he did not ask Hill to get plaintiff to write it. The meeting at which plaintiff said he requested the letter did not occur. Stevens contended that it could not have occurred since he stayed in Framingham on the night of April 26–27—TBS produced a hotel and a restaurant receipt to confirm this. On the 27th, he drove to Rhode Island and then to Connecticut to deliver a speech. Late that afternoon, he returned to Lenox and immediately went to a sports banquet.

Hill denied helping plaintiff with the letter except to provide a Bible citation when asked by plaintiff. Hill never told plaintiff how to get Okabena to deliver the stock faster. She knew that plaintiff made six calls to Okabena but was only present at plaintiff's request.

With respect to keeping the gift confidential, Stevens felt that he should honor plaintiff's wishes. He, therefore, did not tell her family about the gift. He arranged for Jonas to be out of the house because he could tell that plaintiff had not told Jonas of the gift and did not want to do so. Stevens felt that plaintiff should do as God told her and that his first responsibility was to his communicant. He did not advise

her either way about seeking outside advice. Baum told him that the gift was not proceeding quickly but he did nothing. He did not see plaintiff from April 11 until the gift was completed.[9] He did not know of the post office box until the litigation began.

The May 20 letter to plaintiff was a sincere letter which Stevens sent because of the continuing problems between Jonas and plaintiff. It was not a sham and neither Stevens nor Hill asked plaintiff to leave it where Jonas would find it. Stevens was not telling plaintiff in private anything that was contrary to what he said in the letter.

### An Active Interlude

*Plaintiff's Testimony*

Because of Okabena's breach of confidentiality (in telling her father of the planned $5,000,000 gift) and because Stevens suggested it to her, plaintiff decided to retain a new attorney, a new stockbroker and a new accountant. In June 1985, Stevens and Hill introduced plaintiff to Andrew Campoli, TBS' attorney. Stevens also introduced her to James Freed, a broker with Dean Witter Reynolds, Inc. (Dean Witter) who had been recently retained by TBS to be its broker (mainly to handle the $5,000,000 gift). Finally, plaintiff chose Rick Burkhart, TBS' accountant, to be her accountant. She chose all three based on Stevens' recommendations without delving into their qualifications.

From July to November 1985, plaintiff met with Campoli many times, always with Hill in tow. Some meetings were taped by plaintiff at Hill's request. Hill reported to Stevens all that occurred at the meetings. The two reasons for seeing Campoli were the drafting of a new will and the drafting of an agreement between Jonas and plaintiff.

---

**8.** Contradictory deposition statements by Schaller were explained by Schaller and others as due to nervousness at the deposition and severe pain in April 1985 due to an automobile accident.

**9.** This testimony by Stevens is inconsistent with his other testimony that he met with plaintiff on April 30—when he arranged for Canino to take Jonas out to dinner, though he claims he played a much lesser role in those arrangements than plaintiff alleged.

The will was discussed for five months before plaintiff executed it on December 13, 1985. In the will, she left the bare statutory minimum to Jonas, with Stevens as trustee for most of that. She left only her jewelry to her children.[10] Everything else went to TBS.

Stevens wanted her to get Jonas to sign an agreement after some unflattering newspaper articles appeared in a local paper, the Berkshire Eagle. The articles were a three-part series which reported allegations of dissension among former TBS members and pastors, improper actions by Stevens and other TBS members to get people to give money to TBS and eavesdropping by TBS. Hill was a major force in the drafting of the agreement— several drafts are in her handwriting. In pertinent part, the agreement stated that plaintiff would give Jonas $1,600,000 to do with as he wished, plaintiff would not make gifts from the principal of her estate without Jonas' consent, and plaintiff was leaving Jonas "an incredible amount" in her will.[11] Jonas in return was to stop harassing plaintiff about her gifts and her beliefs. Plaintiff signed the agreement on December 16; Jonas never did. Stevens told plaintiff that the part about not giving from principal was only to be for a short time.

Freed, plaintiff's new broker, communicated his thoughts about investing plaintiff's money to Stevens, but not to plaintiff, at Stevens' request. No one told her that Freed was also TBS' broker. Plaintiff's fortune was transferred from Okabena to Dean Witter.[12] Freed advised her to sell all of her Dayton–Hudson stock and invest in higher income-producing items. She discussed the tax implications with both Freed and Burkhart, TBS' accountant. She sold the stock and incurred a large tax liability. At trial, she did not remember writing a letter to Freed in which she stated that she understood the tax implications of the sale and still wanted to go through with it. Jonas was never informed of the change to a new attorney and broker.

Between July and November, 1985, plaintiff gave TBS an additional $80,000 in a series of checks: $14,000 in July; $50,000 in September; $10,000 in October; and two checks for $4,000 and $2,000 in November. No evidence was introduced as to the events surrounding these gifts. Plaintiff also gave Stevens $10,000 in cash in November.[13]

*Defendant's Testimony*

Witnesses for TBS gave the following account of the same events. Plaintiff asked Stevens for the names of Christian lawyers and brokers; she was very disturbed by Okabena's breach and wished to cut her ties with that organization. Stevens supplied her with the name of an attorney he got from a born-again organization, but plaintiff chose Campoli on her own after meeting with him. Campoli is not a born-again Christian. Stevens thought that plaintiff knew Freed before he introduced them; he thought they had initially been brought together by another TBS pastor. Plaintiff chose Freed as a broker only after extensively questioning him about his qualifications while in Stevens' office.

Stevens knew nothing about plaintiff's new will. Any input from Hill was at plaintiff's request; plaintiff was a headstrong lady who insisted on things being done as she wished. Any taping of meetings was done at plaintiff's request. Nei-

---

**10.** Plaintiff sold all of her jewelry in November 1985 while on a trip to New York City with Hill. The proceeds were donated to TBS. Prior to her connection with TBS, plaintiff had already created two trust funds for her children with over $1,000,000 in them; these trusts were not affected by the will.

**11.** This last provision was in obvious conflict with the will which was being prepared by Campoli.

**12.** A portion was retained by Okabena in order for plaintiff to meet some limited partnership obligations that would come due in the future and that plaintiff could not avoid.

**13.** The bankruptcy court included the gifts to TBS in its judgment for plaintiff; it did not allow the $10,000 to Stevens because that was a personal gift to Stevens, not TBS. *See TBS I,* 73 B.R. at 870. Plaintiff has not appealed this exclusion.

ther Hill nor Campoli reported to Stevens about their meetings. Plaintiff sold only a small portion of her jewelry while in New York, mainly items she no longer wore. Giving Jonas a large sum of money was an old idea pre-dating plaintiff's joining TBS. The idea was originally an estate planning mechanism. Stevens was in favor of an agreement between Jonas and plaintiff as a last effort to save their marriage.

Plaintiff's account at Dean Witter required her approval on all transactions before they were made and Freed obtained her approval before any transactions were made. Stevens contended that he had no active role in plaintiff's account even though he lost $10,000 in options trading through the account.

Stevens was very concerned about plaintiff's marriage. In the Fall of 1985, he had meetings with plaintiff concerning her marriage and Jonas' family. On November 7, 1985, he suggested that she try to reach an agreement with Jonas in order to stabilize the marriage. He denied that the timing of this suggestion was related to the publication of the Berkshire Eagle Articles a few days earlier. It was at this time that Stevens and TBS adopted a policy of not accepting gifts without the consent of both spouses. The new policy was not a reaction to the Berkshire Eagle Articles, but rather, was a further attempt to salvage plaintiff's marriage. Plaintiff was informed of this policy. Baum and others told Stevens that plaintiff was headstrong and would continue giving no matter what she was told. Because of this new policy, Stevens rejected a gift of two vans by plaintiff in the late Fall 1985. On November 22, plaintiff met with Stevens and told him that she would go through with the agreement. On December 10, Stevens and plaintiff met again; this time to discuss threats made against TBS and its members.

### The $500,000 Gift

*Plaintiff's Testimony*

In December 1985, plaintiff decided to give another $500,000 to TBS. The genesis of this gift occurred as follows:

Well, while Kathy Hill was living in my home, and Jonas was in Afghanistan, Kathy told me one day that she overheard a conversation while working in the business office between Bruce Dunbar and Jack Leonard. And Jack Leonard had been telling Bruce Dunbar that for the completion of phase two and for phase three to start, that the Bible Speaks needed $500,000 for T.V. equipment, and she told me that she overheard that, and he made me wait all day long to hear her tell me that.

And I was beside myself about my relationship with Jonas, and when she told me that, I thought that if I gave $500,000, that that would solve my marriage problems, and she—Kathy Hill wept and cried and thought that it was—that's why she had overheard the conversation, so that I could give that money.

Plaintiff wrote a check on her Dean Witter account in that amount and a note stating that she had been led by God to make the gift. But Hill had other ideas:

She [Hill] told me [plaintiff] that she thought that from now on whenever I gave money to the Bible Speaks that I must give it in a way so that Carl Stevens would never know about it. And so she investigated how I could give money so that there would be no record of it.

Hill and plaintiff then arranged for an anonymous $500,000 gift to TBS using a cashier's check. Plaintiff received no advice concerning this gift from anyone but Hill.

*Defendant's Testimony*

TBS' witnesses presented another version of the same events. Stevens knew nothing about the $500,000 gift until this litigation began. In December 1985, plaintiff and Hill approached Pastor Leonard and asked him how to make an anonymous gift. He suggested the use of a cashier's check. Plaintiff requested that Leonard tell Stevens to go on television but asked Leonard not to tell Stevens from where the funds for this were coming. Leonard honored her wishes and told Stevens as little as possible: he told Stevens that a gift

would be coming but did not tell him the amount or who was making the gift. Leonard was the president of the Stevens Bible School but was not a trustee of the Church. He, therefore, did not know and had no reason to know of the new policy concerning spousal consent of gifts. Prior to the $500,000 gift, Leonard knew of TBS' policy of not accepting gifts from plaintiff's principal, and he knew that Stevens had rejected the gift of two vans by plaintiff. Leonard did not explain how two vans (worth approximately $40,000) would violate the policy against invading plaintiff's principal but a gift of $500,000 would not. The gift was not returned when Stevens learned of its source because litigation had begun and TBS needed the money as a defense fund.

### The Denouement

Throughout the Summer and Fall of 1985, plaintiff's relationships with her friends and family continued to deteriorate. Her family was concerned about the changes in plaintiff. Her father saw her in Minnesota in the Summer and in Lenox in the Fall. Plaintiff's sister, a social worker, was very concerned after plaintiff and Hill visited her in New York in November 1985.[14] At that time, Hill was present at and active in most of plaintiff's conversations with her sister. Plaintiff specifically denied to her sister having given TBS any money.

The Berkshire Eagle Articles appeared in early November 1985. Jonas' father sent the articles to plaintiff's father who distributed them to other family members. At this point, the family, including Jonas after he returned from Afghanistan, decided that something had to be done. They arranged to have plaintiff examined by a psychiatrist without her knowledge while she was in New York in December.[15] They also decided to have plaintiff come to Minnesota without any TBS members on hand through the pretense of a surprise birthday party for her father.

On December 26, 1985, plaintiff and Jonas met with Stevens in his office. At this time, Jonas asked Stevens whether he had received any gifts from plaintiff since the $1,000,000 gift. Stevens response was to "slap[ ] his table, he had the Bible there, he said, 'Jonas, I swear before Jesus Christ and on the Bible that I have never taken any money from Betsy without your knowledge.' " Although Stevens' statement was not true, plaintiff believed it to be true.

The family's ruse worked: plaintiff and Jonas went to Minnesota without any TBS members accompanying them. Once there, a surprise birthday party was duly held at a house other than her family's. After the party, the family told plaintiff that they wished to talk to her and to introduce her to two other people. This was the beginning of the exit counselling or deprogramming.[16] After initial resistance, plaintiff began to accept the treatment, which consisted of talking to her family and the two exit counsellors and of viewing videotapes about cults and mind control groups. The turning point for plaintiff was when Jonas reminded her of the December 26, 1985 meeting with Stevens in which he swore he had taken no further gifts without Jonas' knowledge. When she realized that she had believed this patent lie, she decided that she needed help.

No one threatened plaintiff with the loss of her children or an incompetency hearing if she refused the exit counselling. Nor did anyone force plaintiff to remain in Minnesota. Her family wanted plaintiff to be able to think for herself; they were not interested in changing her religious beliefs.

14. This was the jewelry selling trip.

15. This examination was accomplished as follows. Plaintiff's sister hosted a musical evening at her apartment in New York and invited plaintiff and the psychiatrist, Dr. Halperin. After being introduced, the plaintiff and Halperin talked together for about forty-five minutes. Plaintiff did not know that Dr. Halperin was in fact examining her. In January 1986, Halperin examined plaintiff again, this time with her knowledge and consent.

16. Although there was some discussion on the difference between these two terms, the terms were used, for the most part, interchangeably at trial. For consistency, we will use the term used by the bankruptcy court—exit counselling.

After a week with her family, plaintiff and Jonas went to Unbound, an Iowa program, for more exit counselling before returning to Lenox. During this time, plaintiff drafted a new will and consented to a temporary conservatorship.

## III. MASSACHUSETTS LAW ON UNDUE INFLUENCE

In Massachusetts, "the elements necessary to prove undue influence [are] '(1) A person who can be influenced, (2) the fact of deception practiced or improper influence exerted, [and] (3) submission to the overmastering effect of such unlawful conduct.'" *Miles v. Caples,* 362 Mass. 107, 284 N.E.2d 231, 235 (1972) (quoting *Neill v. Brackett,* 234 Mass. 367, 126 N.E. 93, 94 (1920)). "The nature of the undue influence that will invalidate a will or a transfer inter vivos is explained in *Neill v. Brackett,....* As to either sort of instrument, the nature and effect of undue influence is the same." *O'Hearn v. O'Hearn,* 327 Mass. 242, 97 N.E.2d 734, 735 (1951). "[I]t generally takes less to establish undue influence" when a confidential relationship exists between the parties. *Heinrich v. Silvernail,* 23 Mass.App.Ct. 218, 500 N.E. 2d 835, 841 (1986) (citing *Doggett v. Morse,* 299 Mass. 383, 12 N.E.2d 867 (1938)), *further review denied,* 399 Mass. 1101, 503 N.E.2d 665 (1987); *see also Bruno v. Bruno,* 384 Mass. 31, 422 N.E.2d 1369, 1372

(1981) ("unfair persuasion in the context of a confidential relationship constitutes undue influence in Massachusetts"); *Neill,* 126 N.E. at 94 ("careful scrutiny" must be given to transactions involving fiduciaries or intimate parties). It is important to point out that we have decided this case assuming that there is *no presumption* of undue influence in such circumstances.[17] We have assumed no more than that one in a confidential position has a duty to disclose facts which should be disclosed in light of the confidential relationship. *Markell v. Sidney B. Pfeifer Foundation, Inc.,* 9 Mass.App.Ct. 412, 402 N.E.2d 76, 95–96 (1980) (quoting *Reed v. A.E. Little Co.,* 256 Mass. 442, 152 N.E. 918, 920 (1926)). This is a principle that would apply to religious and nonreligious circumstances alike. We also have strictly applied the legal rule that, the burden of showing undue influence is on the party seeking to avoid the transfers. *See Tarricone v. Cummings,* 340 Mass. 758, 166 N.E.2d 737, 740 (1960) (collecting cases).

■ Massachusetts has never directly addressed the question of whether a pastor-communicant relationship is *per se* a confidential one when undue influence is alleged.[18] We need not decide whether Massachusetts would hold that the pastor-communicant is by itself a confidential relationship. Here, we have found such a rela-

**17.** The district court cited *Barnum v. Fay,* 320 Mass. 177, 69 N.E.2d 470 (1946), for the proposition that "there is a presumption of undue influence when a gift is made pursuant to a confidential relationship." *TBS II,* 81 B.R. at 760. *Barnum,* however, dealt with the higher fiduciary relationship between an attorney and a client. *See also Markell v. Sidney B. Pfeifer Foundation, Inc.,* 9 Mass.App.Ct. 412, 402 N.E.2d 76, 94 (1980) (transactions with fiduciaries are "presumptively improper"). To reach the level of a fiduciary relationship, however, it must "manifest the relinquishment of control over financial affairs, the conferral of wide authority to act on important matters and make discretionary judgments, or the degree of reliance that usually lie[s] at the core of recognized fiduciary relationships...." *Heinrich,* 500 N.E.2d at 841 n. 8. There has been no claim that Stevens or anyone else from TBS stood in a fiduciary relationship vis a vis plaintiff. The bankruptcy court refused to use a presumption because of the unsettled state of Massachusetts law in this

area. *TBS I,* 73 B.R. at 859 (collecting cases and discussing issue). We adopt that court's statement that "the parties have tried this case without reference to presumptions, and we decide it without relying on any presumption." *Id.*

**18.** The closest the Supreme Judicial Court has ever come is in *New England Merchants Nat'l Bank of Boston v. Mahoney,* 356 Mass. 654, 255 N.E.2d 592, 595 (1970), where the following is stated:

J. Harold Mahoney's contention that Right Reverend Monsignor Enright exerted undue influence on and abused his confidential relationship with Dr. Mahoney does not require extensive discussion. No evidence was introduced concerning the relationship, other than that the men were friends, and that Dr. Mahoney was one of Monsignor Enright's parishioners. In addition, we note that the appointments to Monsignor Enright were not personal gifts.

tionship on the basis of *other* factors alone such as the close contact between the parties in the context of their relationship, *Heinrich,* 500 N.E.2d at 840–41, and knowledge by the recipient that the donor trusted or depended upon him, *Eddy v. Eddy,* 281 Mass. 156, 183 N.E. 268, 270 (1932), and requests by the donor for the recipient's advice or help, *Doggett,* 12 N.E.2d at 870.

"Undue influence, while sometimes susceptible of proof by direct testimony, may be exercised by indirect and secret ways, which are disclosed only in their result." *Raposa v. Oliveira,* 247 Mass. 188, 141 N.E. 870, 870 (1924). Because undue influence is often practiced in "veiled and secret ways," its existence may be inferred from such factors as disproportionate gifts made under unusual circumstances, the age and health of the donor, and the existence of a confidential relationship. *Neill,* 126 N.E. at 94; *see also Eddy,* 183 N.E. at 269 (inexperience with financial matters and disposition of funds needed to generate sufficient income are facts to be considered); *Slater v. Munroe,* 316 Mass. 129, 55 N.E.2d 15, 16 (1944) (comparing size of questioned bequests to size of entire estate).

Two other factors are also important under Massachusetts case law. One, attempts by the recipient to isolate the donor from her former friends and relatives can be considered in determining undue influence. *See, e.g., Livermore v. Seward,* 311 Mass. 389, 41 N.E.2d 290, 295 (1942); *Smith v. Stratton,* 302 Mass. 17, 18 N.E.2d 328, 330 (1938); *Mirick v. Phelps,* 297 Mass. 250, 8 N.E.2d 749, 751 (1937); *Hoffman v. Hoffman,* 192 Mass. 416, 78 N.E. 492, 493 (1906). Two, a court can "also consider that she [the donor] acted without independent and disinterested advice...." *Old Colony Trust Co. v. Yonge,* 302 Mass. 49, 18 N.E.2d 335, 337 (1938); *see also Tarricone,* 166 N.E.2d at 741; *Israel v. Sommer,* 292 Mass. 113, 197 N.E. 442, 447 (1935); *Raposa,* 141 N.E. at 871. Thus, the continuation of former relationships and the availability of independent counsel may help in counteracting an inference that undue influence played a role in the transactions.

In sum, "[a]ny species of coercion, whether physical, mental or moral, which subverts the sound judgment and genuine desire of the individual, is enough to constitute undue influence. Its extent or degree is inconsequential so long as it is sufficient to substitute the dominating purpose of another for the free expression of the wishes of the person [who gives]." *Neill,* 126 N.E. at 94. Nonetheless, "[t]here must be a solid foundation of established facts upon which to rest an inference of its existence." *Neill,* 126 N.E. at 94. And, "[t]he mere opportunity to exercise undue influence and the mere existence of a confidential relationship do not establish undue influence...." *Eddy,* 183 N.E. at 270.

At trial, TBS stipulated that plaintiff was "susceptible", *i.e.* a person who could be influenced, thus conceding the first prong of the Massachusetts undue influence test. Our discussion, therefore, will focus on the second and third prongs of the test: deception practiced or improper influence exerted and submission to the unlawful conduct.

### The $1,000,000 Gift

■ With these principles in mind, we turn to the first large gift made by plaintiff to TBS. Plaintiff testified that the idea for the $1,000,000 gift came to her as follows:

Well, when we got back in the car, [on the way from Framingham to Lenox,] Carl Stevens said to me, "Betsy, it seems like you've really been hearing from the holy spirit." And when he said that, I got three thoughts in my head. One, two, three. And I said, "Yes, I really have been hearing the holy spirit." And in fact, I had my notebook out, and I turned on the little light in the backseat of his car, and I wrote down the three things that I heard in my head that I should do. And the first one was that I should get baptized. The second one was that my children should be dedicated in The Bible Speaks in a certain kind of ceremony that they do with children, and that I should give a million dollars to the Bible Speaks.

There is no evidence that making the gift was suggested by anyone at TBS or that anyone at TBS told plaintiff that she should give the money in order to cure Baum's headaches. That notion also originated with plaintiff. Stevens had told her that her mission was to give and that her gifts would affect great events; at this time, he did not, however, make any specific statements or suggestions.

There is no doubt that Stevens stood in a confidential relationship with respect to plaintiff. But, a confidential relationship even when combined with the opportunity to unduly influence a person does not prove undue influence. *Eddy*, 183 N.E. at 270. The actions of Stevens and others were not sufficient to give rise to an inference of undue influence. General statements by Stevens and others that plaintiff should give to TBS and that such gifts would do great works are too amorphous to show undue influence. When the plaintiff told Stevens about her belief that the gift would cure Baum's headaches, his "nondisclosure" about this belief was not about a *fact*. A statement (or non-statement when there is a duty to disclose) about "conditions to exist in the future" is not a misrepresentation. *See Chedd–Angier Prod. Co. v. Omni Publications Int'l, Ltd.*, 756 F.2d 930, 939 (1st Cir.1985) (collecting Massachusetts cases). Stevens was under no duty to tell plaintiff that her gift would not cure Baum. At trial, Stevens was not asked whether he believed that the gift could cure Baum's headaches. The failure to disclose the fact that Baum's headaches were not in fact cured occurred *after* the gift was made and could have in no way influenced the gift.

This is not a case, as with subsequent gifts, where the plaintiff had already been misled by prior statements, or where she was convinced to give earlier than she planned to, nor is this an instance where a direct solicitation was made under circumstances where the plaintiff was emotionally isolated from all outside advice and believed her gifts could affect temporal events.

Here, plaintiff received advice from both Jonas and Okabena and she chose to ignore the advice. Plaintiff was in her thirties, in good health, and a college graduate. Plaintiff has failed to establish a "solid foundation" upon which to infer that undue influence was applied to effectuate the $1,000,000 gift. We hold that the courts below erred in finding that this gift was the result of undue influence.

### The $5,000,000 Gift

■ Although the thought of making this gift originated with plaintiff, her decision to make it earlier than had been planned was determined by four factors, all of which were fashioned by TBS' agents. The first was the deliberate fostering by Stevens, Baum and Hill of plaintiff's belief that her gift of $1,000,000 had cured Baum's headaches. The fact was that the headaches continued and all three knew it. Plaintiff testified that, because she believed Baum's headaches had been cured, "I felt that my money had great power and I felt that—I even became to feel that my money—that in giving money to The Bible Speaks that I could change the course of history. I could change human history." Stevens fostered these thoughts: "He said that my money—he said that when I gave money to The Bible Speaks that, that released God's judgment and that that judgment would show itself in cataclysmic events."

The second factor was Stevens' influencing plaintiff not to tell her husband or family about the gift. Plaintiff testified that when she told Stevens that she was going to give TBS $5,000,000 in June, he replied:

Great. And then he said that he thought that Jonas should not know about this gift.

. . . . .

He thought that it was really important that Jonas not know, because—because Satan was controlling Jonas, and he didn't believe that we should let the enemy know about this, because he thought that the enemy would try to stop this gift from happening. And he

thought that Jonas would just be letting all the demons in hell loose if he were to know.

Plaintiff did not tell any member of her family of her intention to give TBS $5,000,-000 because Stevens had told her that her family was evil and not to be trusted.

The third factor was the deliberate misrepresentation by Baum and Stevens that Turkia was being held in Rumania at great danger to his life. Plaintiff told Stevens in April that she wanted to give TBS the $5,000,000 immediately instead of in June as she had planned in order to effectuate Turkia's release. Stevens encouraged this and did not tell that Turkia had already been released and was in no danger.

The fourth factor was the letter Stevens prevailed upon plaintiff to write stating that the gift was prompted by God, and that no one from TBS asked her to make the gift or knew that she was going to make it. This last part was false. Stevens and Baum knew about the gift before it was made and accelerated its delivery.

These facts lead inexorably to a finding of undue influence. If plaintiff had been told that Baum's headaches had not been cured by her first gift of $1,000,000, she may not have made the second gift at all. If she had not been influenced to keep the gift a secret from husband and family, she may not have gone through with it. If she had been told that Turkia was in no danger, she probably would not have accelerated the gift. And the letter composed by Stevens, dictated by Hill and written by plaintiff is damning evidence that Stevens and Hill knew they were engaging in improper conduct.

There was a solid foundation of evidentiary facts from which undue influence was properly found.

### The $500,000 Gift

While plaintiff's husband was abroad and Hill was staying at plaintiff's home, Hill told plaintiff that she overheard a conversation between two TBS officials that $500,000 was needed for television equipment. Plaintiff was greatly concerned about her marriage and decided to give the money in an attempt to resolve her marital problems—having already been convinced that her gifts could effectuate such wishes. Rather than make the gift directly and openly, Hill prevailed upon plaintiff to make it anonymously and without other advice.

We agree with the lower courts that this gift was the result of undue influence. There was a not so subtle appeal for a large gift when plaintiff was concerned about her marriage, and Hill knew that plaintiff believed that large gifts could affect temporal events. The circumstances surrounding the gift were suspicious. At the time, TBS had pervasive control over plaintiff's business and legal affairs. The gift was made without outside advice at a time when the plaintiff was isolated from her non-TBS friends and relatives and when her husband was away.

### The Small Gifts Totalling $80,000

Plaintiff introduced no evidence at trial with respect to the circumstances surrounding the $80,000 in checks she gave TBS in the Summer and Fall of 1985. TBS did not waive the need for separate proof as to each gift. While TBS' attorney admitted that, as a practical matter, these gifts did not make much of a difference, he nonetheless stated that "[i]t's all an issue and they have to make proof to any and all of it." Because of the dearth of evidence, plaintiff has failed to present a solid foundation of facts from which to find undue influence was the cause of these gifts. Neither court below offered an analysis or discussion of these gifts beyond noting their occurrence, *TBS II*, 81 B.R. at 753; *TBS I*, 73 B.R. at 856, and a conclusionary statement "that all of the [plaintiff's] gifts were the product of undue influence exercised upon her by the Church through Stevens," *id.* at 863-64. The rescission of these gifts must be reversed.

## IV. THE FIRST AMENDMENT DEFENSE

TBS makes two arguments for invoking the protection of the first amendment. The

first is that the statements and/or actions of Stevens and others that influenced the plaintiff to make the gifts are protected by the free exercise clause. Or to put it more broadly, the free exercise clause shields the solicitation of funds by a religious organization from attack; the gifts are sacrosanct. This argument invokes the protection of the free exercise clause for TBS.

The second argument, by contrast, seeks the protection of the free exercise clause for the plaintiff, the donor of the gifts. TBS argues that at the time the gifts were made, the only influence plaintiff was under was that of God and her religious beliefs or that even if the gifts were in part caused by improper influence by TBS agents, they were also the result of plaintiff's own sincerely held religious beliefs. In either case, the courts are precluded from inquiring into plaintiff's reasons for making the gifts.

█ We first determine whether the first amendment shields the acts of TBS agents from inquiry and attack. The free exercise clause reads: "Congress shall make no law ... prohibiting the free exercise [of religion]...." The extent and limits of this constitutional guarantee have been delineated. In *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Court set aside a conviction for breach of the peace because it violated the petitioner's constitutional guarantees of religious liberty and freedom of speech. During the course of the opinion, the Court stated: "Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public." *Id.* at 306, 60 S.Ct. at 904. The Court has made it clear that "[o]nly beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion." *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 713, 101 S.Ct. 1425, 1429, 67 L.Ed.2d 624 (1981). The clause does not allow purely secular statements of fact to be shielded from legal action merely because they are made by officials of a religious organization.

Non constat that we accept the breadth of defendants' deductions from the First Amendment cases, leading to their repeated assertions that their religious freedoms are being interfered with. Their case of *United States v. Ballard*, [322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944)], merely holds that there can be no claim that a professed religious tenet was not honestly advanced. It does not hold that a religious organization may make such secular statements as it chooses in seeking contributions, so long as they serve a charitable purpose.

*SEC v. World Radio Mission, Inc.*, 544 F.2d 535, 537 n. 3 (1st Cir.1976); *see also Van Schaick v. Church of Scientology of California, Inc.*, 535 F.Supp. 1125, 1141 (D.Mass.1982) ("The First Amendment protects utterances which relate to religion but does not confer the same license for representations based on other sources of belief or verification."); *id.* at 1140; *Molko v. Holy Spirit Ass'n for Unification of World Christianity*, 46 Cal.3d 1092, 252 Cal.Rptr. 122, 140–41, 762 P.2d 46, 64–65 (rescission of gift on undue influence grounds can be based on secular fraudulent statements concerning the nature of the organization one is joining, *reh'g denied & opinion modified*, 47 Cal.3d 470a, 252 Cal.Rptr. 122, 762 P.2d 46 (1988).

█ Neither our decision in this case nor the proceedings below implicates the religious tenets of TBS or the beliefs of its adherents. The findings and rulings rest solely on secular statements and actions. The facts relied upon have not been derived from an inquiry into the religious principles of TBS or the truth and sincerity of its adherents' beliefs. There has been no inquiry as to whether Stevens and the other TBS adherents were acting in accord with what they perceived to be the commands of their faith. *See Thomas v. Review Bd.*, 450 U.S. at 716, 101 S.Ct. at 1431. Those who run TBS may freely exercise their religion, but they cannot use the cloak of religion to exert undue influence of a nonreligious nature with impunity. The five million dollar gift and the half million dollar gift might have had their seeds in the

religious beliefs of plaintiff but they were both nurtured and brought to fruition by misstatements and distortions of facts that had no basis either in the religious tenets of TBS or the plaintiff's religious beliefs.

■ The second argument, which seeks to shield plaintiff's reasons for making the gifts from judicial examination, fails for two reasons. First, as already discussed, the court was not prevented by the first amendment from determining whether the secular reasons for making and accelerating the gifts was the result of undue influence. Second, the plaintiff has not claimed the protection of the first amendment. TBS may raise only its free exercise claims, not those of the plaintiff. *See Wisconsin v. Yoder,* 406 U.S. 205, 230–31, 92 S.Ct. 1526, 1540–41, 32 L.Ed.2d 15 (1972) ("It is the parents who are subject to prosecution here for failing to cause their children to attend school, and it is their right to free exercise, not that of their children, that must determine Wisconsin's power to impose criminal penalties on the parent."). TBS cannot use plaintiff's former religious beliefs as a shield against plaintiff's claim of undue influence.

We find, as did the courts below, that the free exercise clause to the first amendment is not implicated.

The other issues raised by defendant have been considered but do not merit discussion.

## SUMMARY

The rescission of the gift of one million dollars is reversed.

The rescission of the gifts totalling $80,-000 is reversed.

Affirmed in part, reversed in part.

No costs to either party on appeal.

The motion of April 12, 1988 by plaintiff to dismiss this appeal on the grounds that TBS has no standing to appeal is denied.